**Bonnie VALENTINE, Appellant,**

v.

**Eugene SMITH, Interim President of Arkansas State University; Richard Herget; Stan Langley; Lou Mixon Angelo; Ben McGee and Johnny Allison, Trustees of Arkansas State University and Dr. Clark Elkins, Vice-President of Instruction, Arkansas State University, Appellees.**

No. 80–1460.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 9, 1981.

Decided July 21, 1981.

Berl S. Smith (argued), Stephen M. Reasoner, Barrett, Wheatley, Smith & Deacon, Jonesboro, Ark., for appellees.

Bill W. Bristow (argued), Seay & Bristow, Jonesboro, Ark., for appellant.

Before LAY, Chief Judge, and STEPHENSON and ARNOLD, Circuit Judges.

LAY, Chief Judge.

Ms. Bonnie Valentine, a white college instructor, appeals from a judgment in an employment discrimination suit brought by her against officials of Arkansas State University. Valentine's complaint alleges that she is entitled to relief under 42 U.S.C. § 1981; 42 U.S.C. § 2000d; and the Fourteenth Amendment. This appeal raises important questions about permissible affirmative action under federal employment discrimination statutes and the Fourteenth Amendment.[1]

I. *Background.*

Arkansas State University, like many other colleges and universities, excluded blacks for most of its history. ASU made

---

**1.** This case was originally before this court in 1977; at that time we affirmed Judge Shell's denial of a temporary injunction to Valentine. (*Valentine v. Pritchard*, No. 77–1141 (8th Cir. Apr. 20, 1977)). The major testimony in this case was heard by Judge Shell in 1977. Before final judgment was rendered Judge Shell's untimely death intervened. In February 1980 Judge Roy heard further evidence and she rendered a judgment in May of 1980.

little progress toward desegregation until forced by the federal government. In 1968, HEW's Office for Civil Rights (OCR) began compliance reviews under title VI of states that retained vestiges of a dual system of higher education, which reviews included the ASU campus. In January 1969, OCR wrote Governor Winthrop Rockefeller that the reviews of Arkansas' colleges and universities indicated that the state violated title VI. The state developed a compliance plan. Another campus review at ASU in November 1970, raised further questions about discrimination against minorities. In August 1972, the ASU Board of Trustees made it the policy of the university to exert every reasonable effort to employ minority persons in professional positions. In February 1973, the *Adams v. Richardson* [2] decision ordered HEW to bring Arkansas into compliance with title VI. In May 1973, OCR notified Governor Dale Bumpers that the 1969 statewide plan was inadequate.

The state wrote a new plan but it failed to win OCR approval in 1973. In February 1974, ASU endorsed a revised statewide plan developed by the Arkansas Department of Higher Education. After further revisions, OCR approved the plan in July 1974, and promised to monitor its implementation. In August 1975, OCR documented "extensive failure to implement the Statewide Plan ... [and that] violations of Title VI ... continue to exist." After OCR threatened enforcement actions, the Governor, college and university officials, and OCR representatives met to discuss compliance efforts. In October 1975, ASU submitted its affirmative action program.[3] Compliance reviews by and ASU reports to OCR continued at least through 1976.

During these efforts to desegregate ASU, Bonnie Valentine sought employment there in 1976. Valentine had previously taught business education at ASU from 1967 until

2. *Adams v. Richardson*, 356 F.Supp. 92 (D.D.C. 1973) (court ordered HEW to commence enforcement proceedings against several states, including the State of Arkansas, because their higher education systems were determined to be in violation of title VI of the Civil Rights Act of 1964; *id.* at 94).

3. The plan provided in part:
 4.2 In terms of aggregate performance, there has been a steady increase in the percentage of black faculty among the total faculty, 1.4% in 1973–74, 2.4% in 1974–75, and 3.4% in 1975–76. In 1973–74, there were 4 black faculty among 305 faculty members; in 1974–75, 7 out of 296; and 10 out of 296 in 1975–76. In terms of our goals expressed in the 1974 program, we have more than doubled the then-estimated percentage of black faculty (1.5%). Appendix F.
 4.3 However, college-by-college statistics regarding the number of blacks contacted and interviewed as positions became available are discouraging. While there are indications that more intensive efforts have been made, college by college, to disseminate information about job opportunities more widely, the simple fact is that results are poor. Appendix G.
 4.5 Appendix H contains a college-by-college, department-by-department analysis of minority participation in ASU faculty and a comparison of ASU performance in securing black faculty with the availability of qualified blacks in the national labor pool. This comparison shows that underutilization of blacks exists in every college except the College of

Liberal Arts. The goals that result from the department-by-department, college-by-college analyses are significantly lower than the ones we have set for ourselves. We believe that we have a responsibility to exceed the "goals to go." As black student enrollment increases, we will require more black faculty members to serve student needs, not only as teachers, but also as counselors and role models.
 4.6 Appendix I provides a comparison of the availability of blacks in each discipline to their representation in the national and regional populations and a summary by entry level of University faculty hiring for the past three years. Examination of the comparison reveals that in each discipline blacks represent a smaller percentage of the labor pool than they do in the national and regional populations. Since Arkansas State University draws students from an area which has an above-average black population (23.6%), it has a special opportunity and responsibility to prepare black students for future employment in academic fields in which blacks are currently underrepresented. Although ASU has a small graduate program which offers one specialist and several master's degrees, efforts will be made to interest black students in pursuing graduate studies both here and elsewhere.
Arkansas State University, Affirmative Action Program Pursuant to Title VI of the Civil Rights Act of 1964, at 6–10 (Oct. 1, 1975).

she resigned in 1974. In 1976, Valentine's replacement, Adena Williams, the only black person on the business education faculty, resigned, and Valentine applied for her former position. The position required the applicant to have a masters degree in business education. Valentine had a masters degree, 30 additional hours of credit, and seven years of teaching experience at Arkansas State University.

A faculty search committee, the division chairperson, and the dean of the College of Business Administration rated the applicants. Several of these individuals knew Valentine from when she first taught at ASU, and they recommended her as the most qualified of the sixteen applicants for the job. Dr. Robert Ferralasco, Chairperson of the Division of Business Education and Office Administration, gave a list of names, headed by that of Bonnie Valentine, to Dr. F. Clark Elkins, Vice-President for Instruction, for his consideration. Ferralasco and Elkins met with Marilyn Myers, the affirmative action officer for ASU, to discuss the list. After the meeting, Ferralasco submitted a new list of recommended applicants. Valentine's name was deleted from this list which contained only the names of two black applicants and no whites. ASU hired one of these two black applicants, Georgia Mitchell.

Valentine's burden was to persuade the court that ASU intentionally discriminated against her because of her race.[4] At trial, ASU asserted as a defense that it rejected Valentine because she was overqualified for the position and to hire her would create salary problems because of her previous experience and qualifications. The trial court noted this testimony, but did not seem to rule on this basis. The court dismissed the complaint with prejudice on the basis of ASU's implementation of its affirmative action plan. We agree with the appellant that the record demonstrates that the decision to hire Georgia Mitchell, a black, and reject Valentine, was substantially motivat-

ed by a race-conscious choice by ASU to implement its affirmative action plan.

Valentine testified that both Dr. Ferralasco and Dr. Elkins told her ASU rejected her because she is white. Dr. Ferralasco testified that the top recommendation of the screening committee, division chairman, and Dean Lonnie Talbert was usually selected. Dr. Ferralasco stated that Dr. Elkins said ASU was under a court order to hire a black applicant, if a black met the minimum qualifications, but that ASU would hire Valentine if Myers determined that the affirmative action plan would permit it. Dr. Ferralasco substituted the names of two black candidates for the original list, which contained only the names of white applicants. Dr. Elkins admitted discussing affirmative action concerns at hiring discussions. Dr. Elkins apparently believed HEW viewed the school as having too few minorities and he feared HEW's reaction if the university replaced a black faculty member, Adena Williams, with a white applicant. Dr. Elkins' concern apparently arose from the university's small number of minority faculty in 1976 and previous "old boy school" hiring practices.

The state contends that it rejected Valentine because she was overqualified and not because she is white. Dr. Elkins testified that to hire someone with Valentine's qualifications at the annual salary of $10,500, the university would be buying a lawsuit. The fact that Dr. Ferralasco named none of the whites on his first list to his second list undermines the state's argument. We conclude that Valentine has demonstrated that the motivating factor in rejecting her was based upon the fact that she was white and the university was making a race-conscious choice in deference to its affirmative action plan.

## II. *Fourteenth Amendment.*

The constitutional guarantee of equal protection does not prohibit states from taking appropriate measures to reme-

---

4. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1091, 1094–95, 67 L.Ed.2d 207 (1981).

dy the effects of past discrimination.[5] The Supreme Court has not yet defined guidelines for permissible affirmative action for employing state university faculty. Because the justification for race-conscious affirmative action is remedying the effects of past discrimination, a predicate for the remedy is that qualified persons make findings of past discrimination before the plan is implemented. Absent findings of past discrimination, courts cannot ascertain that the purpose of the affirmative action program is legitimate. Such findings enable courts to ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action. Likewise, a court can determine that the remedy substantially relates to its purpose only if it is certain that the persons shaping and implementing the plan understood the nature and extent of the past discriminatory practices. *See Setser v. Novack Investment Co.,* 638 F.2d 1137 (8th Cir. 1981).

■ The Supreme Court has determined that the Congress,[6] federal courts,[7] and, in some instances, the states[8] have the competency to make such findings of past discrimination as are sufficient to justify a race-conscious remedy.[9] The record reflects that HEW and the District Court for the Dis-

5. In *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), Burger, C. J., and White and Powell, JJ., concluded that Congress could prefer minority contractors in order to avoid perpetuating the effects of prior discrimination. *Id.* at 472–78, 100 S.Ct. at 2771–2774. Powell, J., writing separately concluded that redressing identified discrimination against minority contractors was a *compelling governmental interest. Id.* at 515, 100 S.Ct. at 2794. Marshall, Brennan, and Blackmun, JJ., concurring, concluded that remedying the present effects of past discrimination served *important governmental objectives. Id.* at 519–21, 100 S.Ct. at 2796–2797.

In *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), Brennan, White, Marshall, and Blackmun, JJ., concluded that the need to counteract the effects of past societal discrimination served important governmental interests and justified use of a race-conscious admissions program. *Id.* at 362, 98 S.Ct. at 2784. Powell, J., indicated that ameliorating or eliminating the disabling effects of identified discrimination could constitute a compelling state interest in the presence of judicial, legislative, or administrative findings of constitutional or statutory violations. *Id.* at 307, 98 S.Ct. at 2757.

6. *Fullilove,* 448 U.S. at 478, 100 S.Ct. at 2775 ("Congress had abundant historical basis from which it could conclude ... that prospective elimination of these barriers to minority firm access to public contracting opportunities ... was appropriate to ensure ... equal protection of the laws.") (Burger, C. J., joined by White and Powell, JJ.). *See also id.* at 499, 100 S.Ct. at 2785 ("[T]he National Legislature is competent to find constitutional and statutory violations.") (Powell, J., concurring).

7. *Dayton Bd. of Ed. v. Brinkman,* 433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775–2776, 53 L.Ed.2d 851 (1977); *Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971).

8. *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Cf. United Jewish Orgs. v. Carey,* 430 U.S. 144, 162–64, 97 S.Ct. 996, 1008–1009, 51 L.Ed.2d 229 (1977) (race-conscious remedy permitted without specific findings of previous violation).

9. Justice Powell, in *Bakke,* stated that the University of California was not competent to make the requisite findings of constitutional or statutory violations such as would provide a compelling justification for a race-conscious remedy. 438 U.S. at 309–10, 98 S.Ct. at 2758–2759. The four justices besides Justice Powell who reached the constitutional question in *Bakke* disagreed with him as to the competency of the University of California to institute a race-conscious remedy. As agencies receiving federal funds, universities are explicitly authorized by federal regulations to "take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." 45 C.F.R. § 80.3(b)(6)(ii) (1979). Justice Brennan, joined by White, Marshall, and Blackmun, JJ., stated:

Indeed, the requirement of a judicial determination of a constitutional or statutory violation as a predicate for race-conscious remedial actions would be self-defeating. Such a requirement would severely undermine efforts to achieve voluntary compliance with the requirements of law. And our society and jurisprudence have always stressed the value of voluntary efforts to further the objectives of the law. Judicial intervention is a last resort to achieve cessation of illegal conduct or the remedying of its effects rather than a prerequisite to action.

438 U.S. at 364, 98 S.Ct. at 2786. We need not decide whether Arkansas State University was competent to make findings sufficient to justify the purpose of its affirmative action program. The history of the program reveals that these findings were made by other entities.

trict of Columbia found that Arkansas' colleges and universities did not comply with title VI. Because of these findings and the action taken by OCR, ASU developed its affirmative action program. HEW and the district court are competent to make findings of past discrimination sufficient to justify the remedial purpose of an affirmative action program.[10]

There is no consensus on what findings of past discrimination justify remedial affirmative action.[11] Nevertheless, the issue of whether the findings of past discrimination made by the District of Columbia District Court and HEW were adequate to justify a race-conscious remedy is not even close. Findings of previous statutory violations of title VI by a district court and OCR justify the use of some type of race-conscious remedy by a state to serve its constitutionally permissible objective of remedying past discrimination.

We now turn to the question of whether, as a means to accomplish the plainly constitutional objective of remedying past discrimination, the State of Arkansas can prefer a black applicant over a white for a particular faculty vacancy. Arkansas could not practically achieve its constitutionally permissible ends in the foreseeable future without the use of race-conscious remedies. We examine the means used by Arkansas without any bright line distinction between permissible and impermissible affirmative action plans.[12] Any racial preference must receive a searching examination to make certain that it does not conflict with constitutional guarantees. 448 U.S. at 491, 100 S.Ct. at 2781. Until we know more about the long term effects of affirmative action, however, we are reluctant to discourage states from acting voluntarily to remedy past racial discrimination.[13] A flexible evaluation of the means adopted by Arkansas is all the more appropriate in this case because, on the one hand, the state faced termination of federal benefits and liability for past discrimination against blacks, if it failed to institute an affirma-

10. *Bakke*, 438 U.S. at 301–02, 98 S.Ct. at 2754–2755 (Powell, J.). Justices Brennan, White, Marshall and Blackmun apparently would not require such findings by HEW or the district court as a predicate to affirmative action. *Id.* at 363–66, 98 S.Ct. at 2785–2786. *See also Caulfield v. Board of Ed.*, 632 F.2d 999, 1006 (2d Cir. 1980).

11. Justice Stevens would apparently require finding that the beneficiaries of the race-conscious remedy have been the victims of actual discrimination in the past. *Fullilove*, 448 U.S. at 537–48, 553, 100 S.Ct. at 2805–2811, 2813. For Justice Powell, the remedial purpose of race-conscious remedies could be sufficiently justified by findings of statutory or constitutional violations. *Bakke*, 438 U.S. at 301–02, 307, 98 S.Ct. at 2754–2755, 2757. Justices Brennan, White, Marshall, and Blackmun would permit states to use race-conscious remedies "where there is reason to believe that the evil addressed is a product of past racial discrimination." *Id.* at 366, 98 S.Ct. at 2787; *see also Local 35, IBEW v. City of Hartford*, 625 F.2d 416, 421–22 (2d Cir. 1980); *United States v. City of Miami*, 614 F.2d 1322, 1337–38 (5th Cir. 1980); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671 (6th Cir. 1979), *cert. denied* — U.S. ——, 101 S.Ct. 3079, 69 L.Ed. 2d 951 (1980).

12. The standard of review of the method employed by the state to accomplish its constitutional objective cannot be easily discerned from *Bakke and Fullilove.* Justices Brennan, White, Marshall, and Blackmun would inquire whether the preference "stigmatizes any discrete group or individual and whether race is reasonably used in light of the program's objectives...." *Bakke*, 438 U.S. at 373, 98 S.Ct. at 2790. The Chief Justice would require that the means be narrowly tailored to accomplish the constitutional objective, *Fullilove*, 448 U.S. at 480–82, 100 S.Ct. at 2775–2776, 2777, but his test does not appear to be a very strenuous one. *See id.* at 532–54, 100 S.Ct. at 2803–2814 (Stevens, J., dissenting). Justice Powell would require that the means selected be equitable and reasonably necessary to the redress of identified discrimination, in light of (1) alternative remedies, (2) duration of the preference program, (3) the relevant population or work force, (4) flexibility of the program, and (5) the effect on innocent parties. 448 U.S. at 510–15, 100 S.Ct. at 2791–2793, 2794.

13. In *Fullilove*, the Chief Justice quoted with approval a statement of Justice Brandeis: "To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation." 448 U.S. at 491, 100 S.Ct. at 2781, *quoting New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

tive action plan, and, on the other hand, it faced liability to whites for any voluntary preferences adopted to mitigate the effects of prior discrimination against blacks. *See generally United Steelworkers v. Weber*, 443 U.S. 193, 210, 99 S.Ct. 2721, 2731, 61 L.Ed.2d 480 (1979) (Blackmun, J., concurring); *Setser*, 638 F.2d at 1143–1144; *Hunter v. St. Louis-San Francisco Ry.*, 639 F.2d 424, 425 n.2 (8th Cir. 1981). The test for determining whether Arkansas has adopted constitutionally permissible means is whether the affirmative action plan is "substantially related" to the objective of remedying prior discrimination.[14] A race-conscious affirmative action program is substantially related to remedying past discrimination if (1) its implementation results or is designed to result in the hiring of a sufficient number of minority applicants so that the racial balance of the employer's work force approximates roughly, but does not unreasonably exceed, the balance that would have been achieved absent the past discrimination; (2) the plan endures only so long as is reasonably necessary to achieve its legitimate goals; (3) the plan does not result in hiring unqualified applicants; and (4) the plan does not completely bar whites from all vacancies or otherwise unnecessarily or invidiously trammel their interests.

## III. *ASU's Affirmative Action Plan.*

ASU's affirmative action plan set a goal[15] of raising the percentage of blacks on the faculty to a total of five per cent by 1979.[16] To reach this goal, ASU planned that 25 per cent of the faculty hired between 1976 and 1979 would be black. These goals do not exceed reasonable efforts to remedy ASU's past discrimination. In 1976, when Valentine was not hired for the

14. *See Fullilove*, 448 U.S. at 482–92, 508–10, 519, 100 S.Ct. at 2776–2782, 2790–2791, 2796; *Bakke*, 438 U.S. at 359, 98 S.Ct. at 2783; *United States v. City of Miami*, 614 F.2d at 1338–40; *Detroit Police Officers' Ass'n*, 608 F.2d at 696; *Carter v. Gallagher*, 452 F.2d 315, 330–31 (8th Cir. 1971) (en banc), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

15. The validity of a state's affirmative action program should depend on a determination of the relation of the preference to the purpose of remedying past discrimination and not on whether a state is able to conceal its action in subtle language. Any distinction between goals, quotas and targets is primarily semantic. *See Bakke*, 438 U.S. at 378, 98 S.Ct. at 2793 (opinion of Brennan, White, Marshall and Blackmun, JJ.). But see. Justice Powell's distinction between impermissible quotas and flexible racial preferences. 438 U.S. at 317, 98 S.Ct. at 2762.

16. ASU's affirmative action plan provided in part:

4.7 Looking ahead, we project that by the 1978–79 academic year, blacks will constitute approximately 5% of the total faculty. Of the new faculty we expect to hire between now and 1979, 25% will be black. According to our projections for next year (1976–77), we will hire 3 new black faculty and 15 new white faculty; for 1977–78, 4 blacks and 7 whites will be added; and for 1978–79, 4 blacks and 11 whites. Appendix J. Because of the extreme scarcity of blacks in some disciplines, we do not expect the department-by-department increases to be the same. We intend to reassess bienially our effort to achieve this goal.

4.9 A solution to the difficulty of hiring black faculty may lie in a new approach, one which attempts to develop a faculty labor pool from within.

(a) Recruitment of black students as potential faculty members. ASU will identify prospective black faculty among undergraduate and graduate students. The University will commit funds to professional development programs designed specifically to provide assistance to prospective black faculty to complete their professional training. University counselors and faculty advisors will be informed about the disciplines in which minority representation is low so that they can encourage minority students who show interest and aptitude in those fields to begin training for employment.

4.10 At present, the staff in the President's Office has the responsibility for monitoring the process of recruiting new faculty to insure that qualified blacks are given complete consideration in filling every vacancy. The specific procedures used to assure the implementation of ASU's affirmative action efforts and the data collection procedures used to measure the University's success will be developed by the Affirmative Action Officer, who will be functioning by December 1, 1975.

4.11 In summary, we believe that these positive steps, combined with the work of a full-time affirmative action staff, should enable ASU to reach its goals for hiring minority faculty and to comply with Title VI requirements.

position, ASU had 10 black faculty members among a total faculty of 296 (3.4% of faculty was black). Upon Adena Williams' retirement, the Business College had no black faculty members. If Valentine had been rehired, the Business College would have continued to have no black faculty members at least until the next vacancy occurred. ASU attracts students from an area which has a population which is approximately 23.6% black. We find that the plaintiff has failed to show that ASU's goals exceed those which would be substantially related to ASU's legitimate purpose.

ASU's 25% hiring goal is neither permanent nor even long lasting. Instead, ASU's plan extends over a four-year period and contemplates the achievement of a modest increase in black faculty members. Nothing about the duration of the plan suggests any purpose other than a remedial one and Valentine has not shown that the period of the plan exceeds the time substantially necessary for achieving the plan's remedial purpose.

An affirmative action plan may be constitutionally infirm if it unduly stigmatizes either the beneficiaries or the persons disadvantaged by the plan. *Bakke*, 438 U.S. at 374–75, 98 S.Ct. at 2791–2792. But a plan designed to eliminate past racial discrimination is not invalid merely because some innocent persons bear the brunt of the racial preference. *Fullilove*, 448 U.S. at 484, 100 S.Ct. at 2777–2778. So long as a plan does not result in the hiring of unqualified persons, we conclude that any stigma caused by the plan is constitutionally acceptable. Members of the majority group are rarely, if ever, stigmatized by operation of a racial preference; it is hard for us to believe that people will treat Bonnie Valentine as a second class person because a black person was hired instead of her. The more serious risk of stigma is with the successful minority applicant. The absence—not the presence—of affirmative action stigmatizes minority groups, by perpetuating the disadvantages of minorities. When an institution remedies its past wrongs by providing opportunities for members of previously victimized groups it does not stigmatize those groups. Where the applicant is qualified, the risk of stigma is considerably less because presumably the person can perform the task adequately. The evidence in this case shows not only that Georgia Mitchell was fully qualified for the job but also she performed very well as a teacher. We cannot invalidate ASU's affirmative action plan, or its application to the facts here, on the supposition that someone might be stigmatized.

ASU's affirmative action plan does not require firing any employees to make room for minority applicants. Nor does the plan deprive innocent persons of employment rights or benefits they already enjoyed. The plan contemplates that only 25% of new faculty over a four-year period will be black; we cannot say that this plan completely bars whites from faculty positions.

In summary, because we find ASU's affirmative action goals substantially related to the legitimate goal of ending and remedying previous racial discrimination, because the plan does not require the hiring of unqualified persons, because it is temporary, and because it does not completely bar whites or otherwise invidiously trammel their interests, we conclude that ASU's plan, on its face, is a constitutionally permissible solution to a difficult problem. *United States v. City of Miami*, 614 F.2d at 1338–40; *Detroit Police Officers' Ass'n v. Young*, 608 F.2d at 696.[17]

## IV. *Title VI.*

Valentine seeks relief under title VI of the Civil Rights Act of 1964, § 601, 42

---

17. ASU could achieve its legitimate goal of a faculty with five percent of its members being black if twenty-five per cent of the new faculty members hired between 1976 and 1979 were black. Valentine argues that ASU illegitimately singled out the business college vacancy as an exclusively minority position in violation of the principles established in *Bakke*. Even as-

suming ASU set aside that vacancy as exclusively for blacks, the practice is defensible. To ensure that the university achieves its affirmative action goals some coordinator must have the authority to reserve a particular position for a qualified minority applicant, if such applicant can be found. A particular faculty position may remain occupied for many years and

U.S.C. § 2000d.[18] Section 2000d–3 limits employment discrimination claims under title VI to situations where the federal assistance is designed to provide employment.[19] Valentine has not shown that ASU received federal assistance to provide faculty employment. We dismiss the title VI claim and express no opinion on the issues of (1) whether title VI provides a private right of action,[20] (2) whether a plaintiff may recover compensatory damages under title VI,[21] or (3) whether the Eleventh Amendment bars a money judgment against these defendants.[22]

### V. *Section 1981.*

 Valentine's claim under 42 U.S.C. § 1981 is dismissed on the basis of this court's recent en banc opinion in *Setser v. Novack Investment Co.*, 657 F.2d 962 (8th Cir. 1981). An affirmative action plan of a governmental employer that passes constitutional muster does not violate section 1981. *Local 35, IBEW v. City of Hartford,* 625 F.2d 416, 425 (2d Cir. 1980); *Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 692 (6th Cir. 1979).

Judgment affirmed.

then become open for hiring purposes at any time during a particular academic year due to the faculty member's notice of termination. Moreover, in this case, the initial stages of ASU's faculty hiring process were completed by members of the particular college where the vacancy occurred. No consideration of university-wide policy goals affected the decision-making process until quite late in the search process. The situation in student admissions is distinguishable. In *Bakke,* 100 positions became available each year in the first-year Davis medical class. Also, under both the Davis and Harvard plans, discussed in *Bakke* at 438 U.S. at 316, 98 S.Ct. at 2761, the admissions programs were apparently coordinated from start to finish by a central office which could take into consideration university-wide goals at each stage of the admissions process. Justice Powell deemed constitutionally preferable an approach which was more "flexible" than guaranteeing 16 positions for minorities, because Davis' legitimate goals could be reasonably achieved under the less restrictive plan. 438 U.S. at 315–18, 98 S.Ct. at 2761–2762. Where, as here, a more "flexible" approach may not guarantee the attainment of legitimate university goals because of the nature of ASU's hiring procedures, we conclude that ASU's designation of the business college vacancy as a position for a qualified minority applicant was a constitutional means to achieve ASU's legitimate goals.

18. 42 U.S.C. § 2000d provides:

 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

19. 42 U.S.C. § 2000d–3 provides:

 Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

 See *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226, 1235 n.16 (7th Cir. 1980); *Trageser v. Libbie Rehab. Center, Inc.*, 590 F.2d 87, 89 (4th Cir. 1978); *Caulfield v. Board of Ed.*, 583 F.2d 605 (2d Cir. 1978).

20. See *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). See also *University of California Regents v. Bakke*, 438 U.S. 265, 379, 98 S.Ct. 2733, 2793, 57 L.Ed.2d 750 (1978) (separate opinion of White, J.); *Guardians Ass'n v. Civil Serv. Comm'n*, 633 F.2d 232, 274 (2d Cir. 1980); *N.A.A.C.P. v. Medical Center, Inc.*, 599 F.2d 1247, 1248 (3d Cir. 1979); *Bossier Parish School Bd. v. Lemon*, 370 F.2d 847, 852 (5th Cir.), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

21. See *Chambers v. Omaha Pub. School Dist.*, 536 F.2d 222, 225 n.2 (8th Cir. 1976); *N.A.A.C.P. v. Medical Center, Inc.*, 599 F.2d at 1248 n.1; *Guardians Ass'n*, 633 F.2d at 254–63 (opinion of Circuit Judge Meskill) and 272–74 (opinion of District Judges Coffrin and Kelleher).

22. See *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Weisbord v. Michigan State Univ.*, 495 F.Supp. 1347 (W.D.Mich. 1980).