Wendy **WYGANT**, et al., Plaintiffs,

v.

**JACKSON BOARD OF EDUCATION,**
et al., Defendants.

Civ. A. No. 81–60156.

United States District Court,
E. D. Michigan, S. D.

Sept. 7, 1982.

Joseph A. Warren, III, Lansing, Mich., for plaintiffs.

Jerome A. Susskind, Jackson, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

This action is brought by nineteen (19) non-minority school teachers employed by the Jackson Board of Education. Plaintiffs assert various constitutional and statutory claims against the defendants, the Jackson Board of Education and its individual members. The case is now before the court on cross-motions for summary judgment. For the reasons given below, defendants' motion is granted and plaintiffs' motion is denied.

## FACTS

The roots of this case reach nearly thirty (30) years into the past. It will be helpful, in coming to grips with the problems posed by this case, to review that past. The following statement of facts is adapted from defendants' brief and is not disputed by the plaintiffs.

Before 1953, no black teachers were employed by the Jackson Public Schools. In that year, the first black school teacher was hired. She was one of sixty-one (61) new hires for the 1953–54 school year. By 1961, ten (10) teachers on a staff of 515 were minorities for a minority to majority ratio of 1.8 percent.

By 1969, black students constituted 15.2 percent of the total student population, while black teachers constituted only 3.9 percent of the total teaching staff. It appears that only in 1969 did the Jackson School District seriously turn its attention to the problem of underrepresentation of minorities on the faculty.

In October, 1969, the Superintendent's Professional Staff Ad Hoc Committee recommended that each of Jackson's 22 elementary schools include at least two minority faculty members within one year. The Executive Secretary of the Jackson Education Association (JEA) was a member of that committee.[1] Since only three of the 22 elementary schools then had at least two minority faculty members, implementation of the Committee's recommendation would have required the School Board to hire 40 new minority teachers within one year. The Committee's recommendation was rejected.

Over the next two years, a Citizens School's Advisory Committee, and a Professional Council made up of school administrators and representatives of JEA, studied the problem. By November, 1971, 15.9 percent of the student body was minority, while only 8.3–8.5 percent of the faculty was minority. At that time, the collective bargaining agreement between JEA and the Board of Education mandated that layoffs be imposed on a straight seniority basis. That is, the last hired were the first to be fired.

In January, 1972, the Minority Affairs Office of the Jackson Public Schools solicited the views of all teachers on the district's layoff policy. Ninety-six (96) percent of the teachers expressed a preference for the straight seniority system and opposed a system that would freeze minority layoffs. In this atmosphere, contract negotiations were commenced in the spring, 1972.

---

1. JEA has served as the collective bargaining representative for all Jackson school teachers since 1966.

In retrospect, 1972 appears to have been a critical year for the Jackson School District. In February, race tensions boiled over and violence broke out at the Jackson High School. In the spring, a tentative agreement was reached by JEA and the Board of Education on a new contract, a contract which included increased protection from layoffs for newly hired minority teachers. In September, the teachers returned to work, even though the collective bargaining agreement had not yet been ratified. In the late fall, the teachers struck for a short period of time. Finally, in late fall, the contract for the 1972–73 school year was ratified.

The relevant provisions of that contract have been continued through to the contract challenged in this action and read as follows:

ARTICLE VII.D.1. The Board and the Association, in recognition of the desirability of multi-ethnic representation on the teaching faculty, hereby declare a policy of actively seeking minority group personnel. For the purposes of this contract, minority group personnel will be defined as those employees who are Black, American Indian, Oriental, or of Spanish descendancy. *The goal of such policy shall be to have at least the same percentage of minority racial representation on each individual staff as is represented by the student population of the Jackson Public Schools.* (Emphasis added).

ARTICLE VII.D.2. In order that this goal be expeditiously met, it is agreed that, for vacancies in school buildings in which this goal has not been met, the Board will actively seek, recruit, and hire qualified minority teachers for such vacancies. The Board will annually review each individual staff to ensure proper minority representation.

ARTICLE XII.B.1. In the event that it becomes necessary to reduce the number of teachers through layoff from employment by the Board, teachers with the most seniority in the district shall be retained, *except that at no time will there be a greater percentage of minority personnel laid off than the current percentage of minority personnel employed at the time of the layoff.* In no event will the number given notice of possible layoff be greater than the number of positions to be eliminated. Each teacher so affected will be called back in reverse order for positions for which he is certificated maintaining the above minority balance. (Emphasis added).

In spring, 1973, layoffs were required and the contract language was followed. However, in spring, 1974, the School Board ignored the language of the contract in imposing layoffs. It retained tenured teachers and failed to maintain the percentage of minority personnel which existed at the time of the layoff. As a result, a group of minority teachers sued in federal district court. Judge DeMascio of the Eastern District of Michigan retained the civil rights claims but remanded the breach of contract claims to Jackson County Circuit Court.

In *Jackson Education Association v. Board of Education of Jackson Public Schools,* No. 77–0011484 CZ (Jackson County Cir. Ct., 1979), Judge Britten found that Art. XII.B.1. of the contract did not violate Title VII of the Civil Rights Act of 1964 or the Fourteenth Amendment.

Chastened, the Board apparently adhered to the letter of the contract when layoffs were next required. That course of action led to this lawsuit.

One group of plaintiffs—Wygant, Lamm, Krenkel, Csage, Smith, Diebold, Brzezinski, Crecine, Holton and Zaski—allege that on April 7, 1981, they were notified that they would be terminated for the 1981–82 school year and possibly indefinitely. They allege that they have been displaced by minority teachers or by the effects of the minority retention provisions of the collective bargaining agreement.

A second group of plaintiffs—Bluhm, Burnette, Staska, Kiesel, Janke, Verhoeven,

Maynard and Odell—challenge layoffs which occurred much earlier. They allege that they were displaced by minority teachers with less seniority for various periods of time during the 1976–77 school year.

The plaintiff Ruth Ann Anderson is named in the caption to the complaint, but is not again mentioned. Presumably she belongs to one of the two groups described above, and she will be so treated.

Plaintiffs have challenged their layoffs on a variety of statutory and constitutional theories:

1. Equal Protection, U.S.Const. amend. XIV, § 1.
2. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.
3. 42 U.S.C. § 1981.
4. 42 U.S.C. § 1983.
5. 42 U.S.C. § 1985.
6. Equal Protection, Mich.Const. art. I, § 2.
7. Elliott-Larsen Civil Rights Act, M.C. L.A. § 37.2101 et seq.
8. Teachers' Tenure Act, M.C.L.A. § 38.-71 et seq.
9. Fair Employment Practices Act, M.C. L.A. § 423.301 et seq.[2]

The defendants have moved for summary judgment on or dismissal of all these claims on various grounds. Plaintiffs have countered with their own summary judgment motion. The parties are agreed that the relevant facts are not in dispute. Therefore, the various motions and countermotions will be addressed and ruled on point by point.

DISCUSSION

1. Equal Protection, U.S.Const. amend. XIV, § 1.

a. Prior Judicial Finding of Past Employer Discrimination as Prerequisite to Adoption of Affirmative Action Plan

Plaintiffs argue first that they are entitled to summary judgment because an employer and a union cannot lawfully negotiate a voluntary affirmative action plan which gives preferential treatment to minorities, where there has been no judicial finding of past employer discrimination. Stated in other words, plaintiffs argue that societal discrimination, as opposed to identifiable employer discrimination, is not a lawful basis for the adoption of a voluntary affirmative action plan.

*United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) held that Title VII does not prohibit a private employer from voluntarily adopting an affirmative action plan "to eliminate conspicuous racial imbalance in traditionally segregated job categories." 443 U.S. at 209, 99 S.Ct. at 2730. In *Weber,* there was no judicial finding that the private employer, Kaiser Aluminum, had ever engaged in race discrimination. However, Kaiser's work force statistics for the years prior to the adoption of the affirmative action plan pointed up gross disparities between the number of blacks employed by Kaiser and the number of blacks in the relevant labor market. Thus, *Weber* stands for the proposition that Title VII does not require a judicial finding of employer discrimination before a private sector employer may adopt an affirmative action plan.

*Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir. 1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), extended this particular holding of *Weber* to public sector employers *and* to alleged Constitutional violations.

In *Young,* the Detroit Police Department, after an internal determination that blacks were underrepresented in the department, voluntarily adopted an affirmative action program which promoted black patrolmen to sergeant ahead of white patrolmen who were higher on the eligibility list. The white officers challenged the affirmative

---

**2.** The Fair Employment Practices Act was repealed by Mich.P.A.1976, No. 453, § 804 (Eff. March 31, 1977). It has largely been replaced by the Elliott Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.* It is not a proper basis for this lawsuit and will not be considered further in this opinion.

promotion plan on Title VII and Equal Protection grounds. The Sixth Circuit relied on *Weber* to hold that the internal determination of racial disparities justified the voluntary plan, even though there had been no prior judicial determination of race discrimination.

> [D]iscriminatory acts which might not give rise to legal liability may nonetheless be sufficient to justify a voluntary remedial affirmative action plan... As Justice Blackmun noted in his concurring opinion in *Weber,* a preferential hiring plan which seeks to alleviate an imbalance caused by traditional practices of job segregation is a reasonable voluntary response "whether or not a court, on these facts, could order the same step as a remedy"... Under *Weber,* the district court's holding that "quota relief, when fashioned by the employer without the assistance and direction of the court, is not permitted..." ...cannot stand as a matter of law. 608 F.2d at 689–90.

Having thus held on the Title VII claim, the *Young* court applied the same principle to the Constitutional challenge.

> It was also error to require that there be judicial determination of past discrimination for a state to undertake a race-conscious remedy, as stated by the district court. This requirement would be "self-defeating" and would "severely undermine" voluntary remedial efforts. [Citing *Regents of the University of California v. Bakke,* 438 U.S. 265, 364, 98 S.Ct. 2733, 2785, 57 L.Ed.2d 750 (1978) ].

■ Thus, it appears that plaintiffs' contention that the affirmative action plan at issue here cannot stand because there has been no prior judicial determination that the defendants engaged in racial discrimination, is without merit. Plaintiffs' motion for summary judgment on this ground is denied.

### b. Constitutionality of Affirmative Action Plan

Having determined that a judicial finding that defendants engaged in race discrimina-

tion is not a prerequisite to adoption of the affirmative action at issue here, the court must still determine whether the plan is one permitted by the Constitution.

As an initial matter, there must be some evidence that minority teachers have not enjoyed the same representation on the faculty of the Jackson Public Schools as have white teachers. Justice Brennan, for the majority in *Weber,* adhered closely to the facts of that case and framed this requirement in terms of "conspicuous racial imbalance in traditionally segregated job categories." 443 U.S. at 209, 99 S.Ct. at 2730. Justice Blackmun, in concurrence in *Weber,* held out for an "arguable violation" standard. In other words, employers and unions which had committed "arguable violations" of Title VII would be free to adopt voluntary affirmative action plans without fear of Title VII liability to whites.

For purposes of the Equal Protection clause of the Constitution, the *Young* court stated this requirement as follows: "whether 'there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and that the handicap of past discrimination is impeding access [and promotion] of minorities...' " 608 F.2d at 694. The standard was adopted directly from the opinion of Justices Brennan, White, Marshall and Blackmun in *Bakke.*

> The *Young* court expressly held that: [I]t was error to require proof that the persons receiving the preferential treatment had been individually subjected to discrimination, for "it is enough that each recipient is within a general class of persons likely to have been the victims of discrimination." 608 F.2d at 694.

The reason for this requirement is to permit the court to determine that the purpose of the affirmative action plan is legitimate. *Valentine v. Smith,* 654 F.2d 503, 508 (8th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

The requirement of some showing of previous underrepresentation of minorities

must, of course, be adopted to the facts and circumstances of the particular case. In both *Weber* and *Young* it was appropriate, when searching for evidence of past discrimination, to compare the percentage of blacks in the employer's work force with the percentage of blacks in the relevant labor pool. For example, prior to the adoption of the affirmative action plan challenged in *Weber,* 1.83 percent of Kaiser-Aluminum's skilled workers were black while the relevant work force was 39 percent black. 443 U.S. at 198–99, 99 S.Ct. at 2724.

However, in the setting of this case, it is appropriate to compare the percentage of minority teachers to the percentage of minority students in the student body, rather than with the percentage of minorities in the relevant labor market. It is appropriate because teaching is more than just a job. Teachers are role-models for their students. More specifically, minority teachers are role-models for minority students. This is vitally important because societal discrimination has often deprived minority children of other role-models. *See, Oliver v. Kalamazoo Board of Education,* 498 F.Supp. 732, 748 (W.D.Mich.1980) ("faculty ought to begin to approximate the percentage of minority students in the district").

■ Because of this one vitally important aspect of the teaching profession, the court holds that in applying the *Young* "substantial underrepresentation" standard, it may compare the percentage of minority faculty with the percentage of minorities in the student body, rather than with the percentage of minorities in the relevant labor pool.

Applying this standard, it is clear that minority teachers were "substantially" and "chronically" underrepresented on the Jackson School District faculty in the years preceding the adoption of the affirmative action plan. In 1953, there were no black teachers and by 1961, only 1.8 percent of the faculty was black. The court has not been provided with figures establishing the percentage of black students in the Jackson School District during these years.

■ However, by the school year 1968–69, black students made up 15.2 percent of the total student population, while black faculty members constituted only 3.9 percent of the total teaching staff. While the percentage of minority students remained relatively constant (15.9 percent in 1971), the percentage of minority faculty members increased, but only to 5.5 percent in 1970–71 and 8.3–8.8 percent in 1971–72.[3] These findings were made by the school board and the court holds that the school board was competent to make such findings. *Regents of University of California v. Bakke, supra,* 438 U.S. at 363–64, 98 S.Ct. at 2785; *see also, McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

■ The court finds that this is "substantial" and "chronic" underrepresentation within the meaning of *Young.* Thus, the Fourteenth Amendment would permit the Jackson School Board and the Jackson Education Association to voluntarily adopt, through collective bargaining negotiations, an affirmative action plan to protect minority teachers from the effects of layoffs.

The objective of this affirmative action plan to remedy past "substantial" and "chronic" underrepresentation of minority teachers on the Jackson School District faculty is plainly constitutional. *Valentine v. Smith, supra,* at 509. Therefore, the only remaining question is whether the means adopted by the Jackson School Board to achieve its objective are constitutional.

■ The test is one of reasonableness. *Detroit Police Officers' Association v.*

---

**3.** The 8.3 percent figure appears in the affidavit of Susan Diebold, one of the plaintiffs. The other figures appear in the affidavit of Jane I.

Phelps, custodian of employment and student records and coordinator of personnel operations for the Jackson Public Schools.

*Young, supra,* at 694, 696. The reasonableness test asks whether the affirmative action plan is "substantially related" to the objectives of remedying past discrimination and correcting "substantial" and "chronic" underrepresentation. *Id.* at 696; *Valentine v. Smith, supra,* at 510; *U.S. v. City of Miami,* 614 F.2d 1322, 1338–40 (5th Cir. 1980). *See also, Regents of the University of California v. Bakke, supra,* 438 U.S. at 359, 98 S.Ct. at 2783, *Fullilove v. Klutznick,* 448 U.S. 448, 482–92, 100 S.Ct. 2758, 2776–2782, 65 L.Ed.2d 902 (1980).

■ The court finds that the affirmative action layoff provisions of the collectively-bargained contract between the defendants and JEA are substantially related to constitutional objectives. Therefore, the plan is constitutional.

First, the plan is designed to either 1) retain a sufficient number of minority teachers so that the racial composition of the Jackson School District faculty will roughly approximate that of the student body, or 2) if that ratio has not yet been achieved, then at least to prevent a reduction in the minority to majority ratio. *See, Valentine v. Smith, supra,* at 510–11; *United Steelworkers v. Weber, supra,* at 208, 99 S.Ct. at 2729; *Detroit Police Officers' Association v. Young, supra,* at 696. In practice, the affirmative action layoff provision prevents the loss of minority hiring gains, which is an express policy and goal of the contract. Art. VII.D.2. Clearly, the Board could and did act to increase the number of minority teachers. The layoff provision simply operates to implement that policy. The layoff provision does not *require* that the percentage of minority teachers retained equal or approximate the percentage of minorities in the student body. Rather, it seeks only to prevent the loss in minority hiring gains achieved through operation of the Board's affirmative hiring policy.

Second there is no suggestion that the affirmative action layoff provision is anything more than a temporary measure. *United Steelworkers v. Weber, supra,* at 208, 99 S.Ct. at 2729; *Valentine v. Smith, supra,* at 510–11. In fact, the layoff provisions are part of a collectively-bargained contract of limited duration. These provisions, presumably like all other provisions in the contract, are subject to change whenever the contract is renegotiated.

Third, the layoff provisions do not require the retention of unqualified teachers. *Valentine v. Smith, supra,* at 510–11. A layoff provision, by definition, applies only to those previously hired and, presumably, previously found qualified.

Fourth, the layoff provision does not require the layoff of all white teachers or otherwise unnecessarily or invidiously trammel their interests. *Valentine v. Smith, supra,* at 510–11; *United Steelworkers v. Weber, supra,* at 208, 99 S.Ct. at 2729. Clearly, an affirmative action plan is not invalid merely because some innocent persons bear the brunt of the racial preference. *Fullilove v. Klutznick, supra,* at 484, 100 S.Ct. at 2777; *Valentine v. Smith, supra* at 511. Here, no white teacher is stigmatized by operation of the layoff provision. Layoffs are usually required either because a school district is financially strapped, or because student enrollment has declined. Layoffs of the sort contemplated by Art. XII.B.1. of the contract are not related to merit.

Furthermore, Art. XII.B.1. does not oust white teachers and replace them with new minority hires, nor does it absolutely bar laid off white teachers from ever again working for the Jackson School District. *See United Steelworkers v. Weber, supra,* at 208, 99 S.Ct. at 2729.

Finally, it is undeniable that the contract, and thus the challenged layoff provision, was collectively bargained. It is difficult for the court to conceive how a plan which has been voluntarily adopted by the membership of the JEA can invidiously trammel the interests of white teachers, a majority of the JEA.

In light of all these considerations, the court concludes that Art. XII.B.1. is sub-

stantially related to admittedly proper objectives and that, therefore, the affirmative action layoff provision is constitutional.

2. Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Defendants contend that plaintiffs' Title VII claims should be dismissed because plaintiffs have not complied with administrative prerequisites. Specifically, defendants argue that plaintiffs have not produced the required notice of right-to-sue from the Equal Employment Opportunity Commission (EEOC).

A Title VII action may not be filed in the district court unless the plaintiff has first filed an administrative charge with the EEOC. 42 U.S.C. § 2000e–5(f)(1). Ordinarily, a plaintiff demonstrates compliance with this requirement by securing and producing a notice of right-to-sue from the EEOC. This requirement is jurisdictional and may not be waived. *Foreman v. General Motors Corp.,* 473 F.Supp. 166 (E.D. Mich.1979).

Since the plaintiffs have neither produced a notice of right-to-sue from the EEOC, nor otherwise alleged that the administrative prerequisites of Title VII have been fulfilled, all Title VII claims must be dismissed for lack of jurisdiction. Fed.R. Civ.P. 12(b)(1).

3. § 1981, § 1983, § 1985

It follows from the court's holding as to plaintiffs' Equal Protection claims, that the defendants must also be granted summary judgment on plaintiffs' § 1981, § 1983 and § 1985 claims.

Section 1981 forbids with some specificity, what the Constitution forbids generally. *Detroit Police Officers' Association v. Young, supra,* at 692. It also permits what the Constitution permits. *Id.* at 692. Therefore, an affirmative action plan of a governmental employer that passes constitutional muster does not violate § 1981.

*Id.; Valentine v. Smith, supra,* at 512. Since the court has already determined that the affirmative action plan did not violate the Equal Protection clause of the Constitution, plaintiffs' § 1981 claims must be dismissed.

The same is true of plaintiffs' § 1983 claims. Section 1983 provides a remedy for any person deprived under color of law of "any rights, privileges, or immunities secured by the Constitution and laws." The only conceivable right, privilege or immunity that plaintiffs could have been deprived of was their Constitutional right to equal protection of the laws. However, the court has held that the affirmative action plan at issue did not deprive them of that right. Therefore, defendants are entitled to summary judgment on plaintiffs' § 1983 claims.

Plaintiffs have not specified which subsection of § 1985 they are suing under. However, the court assumes the plaintiffs are suing under § 1985(3) which provides a remedy for conspiracies to deprive a person or class of persons "of the equal protection of the laws, or of equal privileges and immunities under the laws." Since the court has already held that plaintiffs have not been denied their rights to equal protection, it follows that defendants cannot be liable under § 1985(3). Defendants are entitled to summary judgment on the § 1985 claims.

Furthermore, even if defendants were not entitled to summary judgment, plaintiffs' § 1985(3) claims would have to be dismissed because plaintiffs have failed to state a claim. Fed.R.Civ.P. 12(b)(6). A "conspiracy" is an essential element of a § 1985 claim. *Griffin v. Breckinridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). Plaintiffs have not alleged that defendants engaged in a conspiracy.

4. State Constitutional and Statutory Claims

As all plaintiffs' federal claims have been dismissed, there is no basis for

**1204**

the court to assert jurisdiction over plaintiffs' state law claims. Therefore, plaintiffs' claims under the Michigan Constitution, the Elliott-Larsen Civil Rights Act, and the Teachers' Tenure Act must be dismissed. *United Mineworkers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

So ordered.