Neal VAN AKEN, Ronald G. Baranowski, Eric Barterian, Thomas Boland, Gary Britt, Scott Brooks, David Brumm, Dennis Campbell, Alan Cauchi, Michael R. Chartier, James Cichocki, Steve Cleland, Kenneth P. Gerometta, Dennis Girardin, Paul H. Grimm, Jack Hansen, David B. Jones, Michael Kovalcheck, Jeffrey D. Kramer, Michael Leskie, John Lis, Keith Loomis, David W. Lowe, James J. MacDonald, Thomas W. Melchior, Stephen R. Mirch, George Orzech, Dennis M. Palm, Patrick H. Payne, Charles Pinkston, Andrew Rushford, Jr., Mark Stelzer, George L. Talbot, Jr., James E. Todd, Carl Towne, Edward J. Tujaka, Jr., David M. Victor, and Alan Syrzykowski, Plaintiffs,

v.

Coleman A. YOUNG, individually and in his capacity as Mayor of the City of Detroit; Denise Lewis, individually and in her official capacity as Personnel Director of the City of Detroit; Jacob Sobieraj, Shirley Robinson Hall, Morris Hood, Sr., David Kerwin, and James Lewis, individually and in their official capacity as members of the Civil Service Commission of the City of Detroit; and City of Detroit, a municipal corporation, Defendants.

Civ. A. No. 77–72443.

United States District Court, E. D. Michigan, S. D.

June 8, 1982.

Robert L. Ziolkowski, Detroit, Mich., for plaintiffs.

Sylvester Delaney, Deputy Corp. Counsel, William Dietrich, Frank W. Jackson, James C. Zeman, Asst. Corp. Counsel, Detroit, Mich., for defendants.

## OPINION

GILMORE, District Judge.

For more than a century, the City of Detroit's Fire Department was, for all practical purposes, the private preserve of white males. No black even served in the Department until 1938, and until the 1970's black representation was minimal. Blacks at the upper level of the Department were nonexistent, as were female fire fighters.

The plaintiffs in this lawsuit, 38 white male applicants for positions as fire fighters, challenge the voluntary affirmative hiring practices of the City of Detroit. The outcome of the suit turns on whether the defendants can pass over white male applicants in favor of qualified minority and women applicants where a proper body has made the determination that a significant course of past discriminatory conduct justified out-of-rank order hiring of minorities and women. The answer is yes.

In 1977, each of the plaintiffs was placed on an eligibility roster in rank order based on his performance on various hiring exams. Each of the plaintiffs was passed over in favor of an allegedly less qualified minority person or woman, all of whom were qualified for hire. Some of the plaintiffs were eventually hired, and their claims are limited to earlier seniority dates and back pay.

Plaintiffs' action is brought under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VI and VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Plaintiffs also maintain a state claim resting upon the Elliott-Larsen Civil Rights Act, M.C.L.A. § 37.2101 *et seq.* They claim as to Title VII and § 1981 that a *prima facie* case has

been made under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and that a pattern and practice of discriminatory conduct has been proved. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). They therefore claim that it is the defendants' burden of proof to show that the nonselection of each plaintiff was attributable to legitimate nondiscriminatory reasons.

They further claim that, even if the out-of-rank order hiring was legitimately based upon prior discrimination, the affirmative hiring plan was unreasonable in that it unnecessarily impacted upon the rights of innocent white applicants and was aimed at future gains in black population. *Valentine v. Smith*, 654 F.2d 503 (8th Cir. 1981). As to Title VI and the Equal Protection claims, plaintiffs contend that the out-of-rank order hiring, along with other acts by the defendants, manifested an intent to discriminate against white male applicants unjustified by any past discrimination. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).[1]

Defendants respond that race and sex conscious hiring, authorized by the Civil Service Commission, was based upon the Commission's finding of past discrimination and, therefore was a legitimate attempt to remediate. They further claim that statistical proofs, which demonstrate more than three decades of gross disparity in black and women hiring remain entirely unexplained and compel a finding by this Court of past intentional discrimination by the defendants. The defendant City concedes that it discriminated against blacks and women historically. That admission, however, must be viewed very carefully in light of its benefit to the defendant in this litigation. It is not likely that any minority

individuals could now come forward and recover damages on the basis of the admitted discrimination. Nevertheless, the City's admission should be accorded some weight in view of the strong possibility that the City could be subject to court orders requiring expensive and continuous measures to remedy past wrongs.

## I

This case, once again, confronts the Court with the deplorable legacy of race discrimination in our society. From 1938 through 1968 approximately 50 black males and no women were hired in the Fire Department, while in the same period at least 2047 whites were hired. The testimony of Mark Frieman, defendant's expert, showed that at no time in the years from 1938 through 1968 did the number of black hires even approximate the number that would have been hired assuming a random nondiscriminatory selection process.

From 1940 through 1949 no black was hired, while the black portion of the labor pool moved from 6.9 percent to 13.2 percent, and 300 fire fighters were hired in 1947 alone. In 1961, when the black portion of the labor pool reached 24.6 percent, 62 white males were hired and no blacks. In 1968, 47 white males were hired and four black males.

In an effort to justify the disparity in black hires, plaintiffs offered several explanations, including the contention that blacks did not like the 24 hour shifts nor the low wages. Charles A. Myers, a witness for plaintiffs, who worked in the Personnel Department of the City of Detroit from 1934 until 1965, when he held its top position, testified that he worked very hard with the Urban League from 1948 forward to promote black hiring. He stated that few blacks ever applied, and that they did not like the low wages and shift work as compared to private industry. He further opined that the job was more attractive to whites because of family relationships with-

---

**1.** Although the plaintiffs have advanced claims under Title VII, 42 U.S.C. § 1981, and under the Fourteenth Amendment and Title VI, the Court need only engage in one analysis for each group of Federal claims. Title VI reaches no further than the Fourteenth Amendment.

in the Department, which seemed to advertise the job by word of mouth. He also stated that minority hiring was much better in all other City departments.

Plaintiffs also attempted to draw support from the testimony of John T. King, an employee of the Fire Department for 25 years and presently an administrative assistant to the Department. He testified that he took the written test along with six or seven other blacks and that five were hired in 1956. Because of this, plaintiffs claim that the selection process historically did not have an adverse impact upon blacks.

Other witnesses also referred to difficulty in attracting blacks to the Department, but most of them did not draw conclusions supportive of plaintiffs' claims. Even Myers' testimony undercut plaintiffs' case for he testified that the word was out that not many blacks were being hired in the Fire Department, and admitted that wages in the Fire Department were much better than wages paid in many unskilled jobs and better than many other City departments. It is clear that the wages in the Fire Department were higher than most wages paid in unskilled jobs, and that wages in the Fire Department were relatively higher than wages enjoyed by many blacks. Furthermore, there is no explanation as to the relative unsuitability of blacks for 24 hour shift work.

On the other hand, many witnesses testified as to discriminatory practices over the years in hiring in the Detroit Fire Department. Witness Samuel Dixon, a Chief of the Fire Department and a black, who became a member of the Department in 1952, recounted how he had not been allowed to sleep on a bunk that might be used by whites on the other shifts, whereas it was the custom of the whites to share bunks from shift to shift. He cited many other instances of discrimination against him in the Fire Department, including one instance where he found out he was not allowed to work on the same shift with another black on the few occasions in which such an assignment might come up.

Robert Walter, who served in the Personnel Department from 1940 until 1981, most recently as Director of the Department, testified that the written exam was the most significant barrier to black hiring. The written exam has been used every year for hiring since 1936. Mr. Walter also testified that the personal interview screened out a higher proportion of black applicants. He further stated that often an eligibility list would only be used for one year, and thus only the top portion of the list was ever used for hiring.

Witness King testified that, in 1977, 32 percent of all whites in the Fire Department had a father, uncle, or brother-in-law in the Department. He emphasized that invariably whites were the first to get applications, and that this was important because, where applicants had the same score, the time of application served as a tie breaker. He testified that as recently as the 1977 hiring period relatives of white employees stayed overnight in the Fire Academy to receive the first applications. He further testified that black recruitment efforts had been hampered by the requirement of a high school diploma, but he learned that a substantial number of whites had no more than a tenth grade education.

Other witnesses, including Philip Gorak, Deputy Commissioner of the Department, and Denise Lewis, Personnel Director of the City of Detroit from 1974 through 1980, testified that historically there had been intentional discrimination in the treatment of black fire fighters in the Department and in their hiring practices. Ms. Lewis further opined that there had been little effort spent in recruiting blacks, and in some cases there were efforts to discourage blacks from applying.[2]

2. Much, if not all, of this testimony and other testimony presented in this case was also presented to the Civil Service Commission on January 20, 1976. The transcript of that hearing was received as Exhibit 163. The subject of that hearing was the implementation of affirmative action procedures, and the transcript evidences the Commission's belief that blacks had been intentionally discriminated against.

In 1970 and 1971, black males were hired in numbers commensurate with the black percentage of the labor pool. In 1970, 34 blacks and 88 whites were hired, and for 1971 the figures were 24 and 63, respectively. No women were hired.

By 1972, the Fire Department was approximately 7.5 percent black, and in that year certain affirmative recruitment measures, such as increased advertising, were in operation. However, the first class selected for the Academy that year contained 39 whites, one Hispanic, and no blacks or women. This class was produced from a new eligibility list.

The Mayor's Office and the Common Council, very disturbed by the composition of the class, cited the Department for failure to comply with the City Council's Resolution governing affirmative action. Among other things, they called for an investigation of the use of unvalidated exams and the hiring of exclusively white males.

It is clear that during the 1972–73 hiring period the City used unvalidated written and agility exams. It is clear that the written exams adversely impacted upon black males. This is shown by the following summarization.

### SITTING FOR WRITTEN EXAM

|  |  | B | W |
|---|---|---|---|
| June | 1972 | 452 | 113 |
| August | 1972 | 554 | 289 |

### FAILING EXAM

| B | W |
|---|---|
| 212 | 17 |
| 198 | 23 |

Shortly after the 1972 experience, the City established a transfer policy where individuals could transfer into the Department from another city service without taking the written exam. This transfer policy was substantially involved in only two Academy classes, those of October 30, 1972 and December 1, 1972. There were 32 transferees who joined the class of October 30, and 16 who joined the class of December 1. The racial composition of those two classes was thereby drastically altered.

In the years between 1973 and 1976, the Fire Department did not hire anyone. Layoffs hit the Department and, as more fire fighters were needed in those years, laid-off fire fighters were recalled.

In 1977, hiring recommenced and seven classes of fire fighters were processed through the Academy during 1977 and 1978. These hirings are the subject of the instant lawsuit. Members of the classes were not selected in strict rank order. This was done under Section 6–510 of the City Charter adopted in 1974, which authorized out-of-rank hiring where the Department submitted a request with written reasons acceptable to the Civil Service Commission. That Charter provision provided:

> However, no person seeking to enter the classified service who has taken an examination and been placed on a register of applicants eligible for employment may be passed over in favor of an applicant with a lower examination score *unless the head of the agency involved files with the Commission written reasons for that action acceptable to the Commission.* (emphasis added)

In June of 1977, hiring commenced and the percentage of blacks in the Department rose from approximately 17 percent to approximately 24–25 percent by the end of the hiring period in 1978. Sixty-three percent of the new hires were black, 35 percent were white males, and less than 5 percent were women. In all, approximately 320 new fire fighters were hired.

During that period of time, Fire Commissioner Melvin Jefferson submitted requests to the Civil Service Commission for out-of-rank hiring on seven occasions. Each request was accompanied by statistics showing the number of minorities and women in the Department, and went over ground already covered in prior Civil Service hearings. The requests for minority hires ranged from 60 percent to 75 percent. All

of these requests for out-of-rank hirings were approved by the Civil Service Commission of the City of Detroit under Charter provision 6–510 quoted above.

The 1977–78 hiring took place on the basis of a new eligibility list. Unlike the 1972 selection process, the 1977–78 effort involved significant measures to validate both the written and agility exams. It is undisputed that the agility exam was related to the actual job performance and was therefore content valid.

There is also agreement that the written exam was content valid and correlated well with performance in the fire academy. All witnesses conceded that the written exam had some relationship to job performance, but there is a dispute as to the degree of relationship. Defendants' witnesses stated that reading ability was important because of the use of written instructions, but they concluded that the written exam should have been used as a pass/fail barrier. In this way, defendants submit, the interests of all applicants and the city would have been safeguarded and the adverse impact of the exam minimized.

Plaintiffs maintain that the Court can not properly conclude that the exam adversely impacted upon black applicants. The testimony, however, clearly showed that the black success rate was less than 80 percent of the white success rate. The evidence further showed that blacks have always had a significantly lower success rate on the written portion of the exam. The Court does not believe that 29 C.F.R. § 1607.4(b) precludes a finding of adverse impact.

Plaintiffs further submit that the written exam should be used to strictly rank order all applicants. They rely upon the testimony of Dr. John Hunter, Professor of Mathematical Psychology at Michigan State University. He concluded that the written exam was content valid and a reliable predictor of the performance of the position of fire fighter. His conclusions were premised upon the belief that Academy performance correlated well with job performance, and upon a concept known as validity generalization.[3] Hunter concluded that the written test should therefore be used, and hiring be carried out in strict rank order.

Using a technique known as utility analysis, Hunter predicted that if only the written test were used and hiring was conducted in strict rank order, the City would save, in added productivity, approximately Thirty-Nine Million ($39,000,000) Dollars over 30 years.[4]

Hunter was completely destroyed on cross-examination. He admitted he knew nothing specific about the Detroit Fire Department Academy and its curriculum, and stated that the ability to be a fire fighter depended just as much upon fast reading ability as agility and ability to climb ladders and do other physical tasks that fire fighters perform. He was unable to explain how a person in a wheelchair, who could get the highest grade on a written exam, could be an active fire fighter. He further testified that there was a high correlation between cognitive ability and the ability to be a good lemon picker. Most of Hunter's testimony lacked credibility, and the Court is completely disregarding it.

## II

■ The law governing race discrimination in employment, although not well settled, has been significantly clarified in recent years by the Supreme Court of the United States and in the Sixth Circuit. There is no doubt that the burden of proof, for example, remains with the plaintiff throughout the entire course of the litiga-

3. Validity generalization is defined as the degree to which one can, on the basis of validity data developed in one setting, generalize as to the same type of relationship in another setting under examination. For example, from data relating written exams to job performance in fire departments in the military, it is claimed that the general conclusions about the relationship between the written exam in this case and the position of fire fighter in the City of Detroit can be validly arrived at.

4. Utility analysis is an attempt to derive the economic benefits associated with the use of various employment selection devices.

tion and only the burden of production shifts. This precept should hold valid in the instant case in spite of the misnomer, "reverse discrimination," which is commonly used to describe cases like the present one. In regard to the burden of proof, the Supreme Court has stated:

The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination [established by plaintiff's *prima facia* case] by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the Court that it was actually motivated by the proffered reasons (cites omitted). It is sufficient if the defendants' evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiffs' rejection.... Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facia case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1980).

Thus, plaintiffs must show by a preponderance of evidence that they are the victims of discrimination on the basis of race.

█ More significantly, case authority under both Title VII and the Equal Protection Clause clearly recognizes that white male individuals, unconnected to any past discriminatory acts, may lawfully be called upon to bear some of the burden resulting from voluntarily adopted race and/or sex conscious efforts at remediation. *Kaiser Aluminum v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Baker v. City of Detroit*, 483 F.Supp. 930 (E.D.Mich.1979).

Where voluntary affirmative action measures are taken to remedy the effects of past discrimination, and the measures are truly remedial in scope, a governmental employer is insulated from Title VII liability. *DPOA v. Young*, 608 F.2d 671 (6th Cir. 1979); *Baker v. The City of Detroit, supra.* In *DPOA v. Young*, supra, the Court held that where there was evidence of post-Civil Rights Act discrimination, evidence of pre-Act employment practices was relevant to a legitimate defense. It also held the City was not required to prove that persons receiving preferential treatment under the Affirmative Action Program had been individually subjected to discrimination, nor was it necessary that there be a judicial determination of past discrimination before the City could undertake a race conscious remedy.

The Court stated:

[A]s the Supreme Court made clear in *Weber*, in a case of this kind where 'reverse discrimination' is claimed, the question is not what Title VII requires or what a court might order to remedy a proven Title VII violation. Rather, the question is what voluntary actions may lawfully be taken. As Justice Blackmun noted in his concurring opinion in *Weber*, a preferential hiring plan which seeks to alleviate an imbalance caused by traditional practices of job segregation is a reasonable voluntary response "whether or not a court, on these facts, could order the same step as the remedy"....

*Id.* at 690.

Furthermore, the discriminatory acts that form the predicate for defendants' voluntary race and sex conscious measures need not even be sufficient to give rise to legal liability. *Lehman v. Yellow Freight System*, 651 F.2d 520, 527 (7th Cir. 1981). The Court pointed out in *DPOA v. Young*, supra:

Moreover, discriminatory acts which might not give rise to legal liability may nonetheless be sufficient to justify a voluntary remedial affirmative action plan. Thus evidence of pre-Act discrimination in the present case was relevant to a legitimate defense... Prior discrimination which would constitute a violation but for the effective date of the Statute

is cognizable in concluding that the employer's purpose in implementing affirmative action was consistent with the Statutory purpose of eliminating discriminatory employment practices and their effects. When the question is what a public employer *may* do rather than what it *must* do, evidence of pre-Act discrimination is relevant to the propriety of ostensibly remedial racial preferences. (emphasis in original)

*Id.* at 689.

■ Likewise, under the Fourteenth Amendment, an employer is not prohibited from taking reasonable measures to remedy the effects of past discrimination. *DPOA v. Young, supra; Baker v. City of Detroit, supra; Valentine v. Smith, supra.* In *Valentine,* the Court held that a race-conscious affirmative action program was substantially related to remedying past discrimination where its implementation resulted in hiring that achieved a racial balance of the employer's work force that roughly approximated the balance that would have been achieved, absent the past discrimination. It further held that an affirmative action plan by the Arkansas State University which set a goal of raising the percentage of blacks on the faculty to a total of five percent by 1979, a goal which required that 25 percent of the faculty hired between 1976 and 1979 be black, was substantially related to the objective of remedying prior discrimination and was not violative of the constitutional guarantee of equal protection, because the plan was temporary and did not require the hiring of unqualified persons, nor bar whites or otherwise invidiously trammel their interests.

*DPOA v. Young supra* defined the limits of the Court's inquiry as follows:

[T]he District Court should have considered the finding by the BPC, a public body with competence to act. This should have led to the following inquiries, at least: whether "there is a sound basis for concluding that minority underrepresentation is substantial and chronic, and

that the handicap of past discrimination is impeding access [and promotion] of minorities ..." ... whether any discrete group or individual is stigmatized; and whether use of race is reasonable in light of the objectives of the plan... If this analysis establishes the need for remedial action, the test of reasonableness requires a showing that no other approach offers a practical means of achieving the ends of the program in the foreseeable future.... If the affirmative action plan satisfies these criteria, it does not violate the Equal Protection clause of the Fourteenth Amendment...

*Id.* at 694.

■ Notably, the above equal protection analysis necessarily incorporates an inquiry into whether the means are reasonably related to the ends sought to be achieved. Thus, the scope and impact of the plan itself must be scrutinized. Such an analysis of a remedial plan is also required under Title VII. However, where the equal protection clause is satisfied, so too is Title VII. *Baker, supra.* A comparison of the court inquiry in *Weber, supra,* with the approach outlined in *DPOA, supra,* and *Bakke, supra,* logically dictates such a conclusion.[5]

In justifying their out-of-rank hiring practices, defendants may demonstrate that the Civil Service Commission made a finding of past discrimination, or may present proofs as to past discrimination in hiring practices. Defendants have proved both justifications. Of course, the remedial program must be shown to comport with the standards set forth in *DPOA* and *Valentine.*

### III

#### A. Title VII and § 1981

As a threshold issue under Title VII, the Court must consider plaintiffs' argument that the effective date of the Act for public employers, March 24, 1972, precludes a finding that defendants' affirmative hiring program was remedial. They contend that any

---

**5.** For a collection of case citations as to the reasonableness of the affirmative remedy, see

*Stotts v. Memphis Fire Department,* 679 F.2d 541 (6th Cir. 1982).

statistical disparity in black hiring occurred sometime prior to 1972, and that no new acts of discrimination occurred after that date. In taking this position, they rely upon *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), which held that a public employer who, after becoming subject to the prohibitions against unemployment discrimination contained in Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.) makes all of its employment decisions in a wholly nondiscriminatory way does not violate Title VII, even if it had formerly maintained an all-white work force by purposefully excluding blacks. They rely upon the following language of the Court:

> Racial discrimination by public employers was not made illegal under Title VII until March 24, 1972. A public employer who from that date forward made all of its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white work force by purposefully excluding Negroes....

*Id.* at 309, 97 S.Ct. at 2742.

■ Plaintiffs, however, misconceive the meaning of *Hazelwood.* As the Court pointed out in footnote 15, proof that an employer engaged in racial discrimination prior to the effective date of Title VII might, in some circumstances, support the inference that such discrimination continued, particularly where relevant aspects of the decision-making process had undergone little change. The Court further pointed out that a public employer, even before the extension of Title VII in 1972 to public employers, was subject to the command of the Fourteenth Amendment not to engage in purposeful racial discrimination.

In *Detroit Police Officers Association v. Young, supra,* which was decided after *Hazelwood,* the Court stated at page 689:

> Where there is at least some evidence of post-Act discriminatory practices and effects, pre-Act evidence of a similar nature is relevant to the conclusion of post-Act discrimination. If there is no evidence of post-Act discrimination, the pub-

lic employer cannot be held liable under Title VII.

■ There is no question here that the unexplained statistical proofs compel a conclusion that there were discriminatory practices prior to the effective date of the Act in 1972. Plaintiffs' attempts to explain the statistical disparities as a product of bias on the part of blacks against the job are totally unpersuasive. It is true there was a common perception in the black community that the Fire Department was "lily white" and that blacks need not apply, but that perception was rooted in decades of intentional discriminatory practices by the defendants against blacks.

In addition, the trial testimony demonstrated that the unvalidated written exam was a barrier for those blacks who did apply. There is also evidence of discriminatory practices within the Department. The Court therefore finds that a pattern of both overt and covert institutional practices, combined with an exclusively white "old buddy" and interfamilial network, served to almost completely preclude black participation in the Fire Department. The position of fire fighter for many decades remained, for all practical purposes, the exclusive domain of white males. It is absolutely clear that there was extensive pre-1972 discrimination against blacks in the hiring practices of the Detroit Fire Department.

The question with reference to Title VII, however, is whether there have been post-Act discriminatory practices and effects. The Court finds that there have been. The pattern and practice of race discrimination and subtle white preference extended beyond 1972, for it is clear that no effort was made to validate the written examinations used throughout 1972 and 1973. Moreover, as late as 1977, some whites had an advantage in obtaining applications.

Plaintiffs deny this, pointing out that, during 1972 through 1973, 277 fire fighters were hired, and 131 of them were black. These figures, they contend, show that the selection process was racially neutral. Plaintiffs ignore that such balance was achieved only through by-passing the writ-

ten examination with transfers. The hiring of some black males cannot absolve the defendants from responsibility for using an exam which disproportionately precluded large numbers of blacks from participation in the hiring process. To carry plaintiffs' argument to its ultimate end would mean that no matter how unrelated a job selection device might be, and no matter how many individuals it totally eliminated from hiring consideration, a Title VII violation could not be made out where some blacks passed the exam and were hired.

■ It was pointed out in *Furnco v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978), that "[A] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination." So, too, a balance in new hires does not absolve the defendant for its use of a racially discriminatory selection device. In this regard, the Court in *Teal v. State of Connecticut*, 645 F.2d 133, 135 (2d Cir. 1981) held:

> [W]here a plaintiff establishes that a component of a selection process produced disparate results *and* constituted a pass-fail barrier beyond which the complaining candidates were not permitted to proceed, a prima facie case of disparate impact is established, notwithstanding that the entire selection procedure did not yield disparate results. (emphasis in original)

The Court therefore finds that Title VII was violated after its effective date. Throughout the 1972–73 hiring period the City made sincere efforts to turn its selection process around. Those efforts, nevertheless, did not establish a complete break with every aspect of the City's discriminatory hiring procedures.

■ Moreover, it is clear that voluntary affirmative action procedures need not rest upon a violation of Title VII. *DPOA, supra*. A principal purpose of Title VII is the encouragement of voluntary compliance. Here, the record demonstrates that the defendants did not violate Title VII. There is no doubt that traditional segregative practices created an imbalance in the composition of the Fire Department. The defendants were entitled to remedy this problem. *Weber, supra*.

## B. Equal Protection

What has already been said concerning the existence of discrimination historically provides the basis for the Court's conclusion that the defendants were also guilty of intentional discrimination at least through 1968. As in *DPOA, supra*, a striking, unexplained statistical disparity combined with proven acts of intentional discrimination within the Department compel such a finding. This finding, however, is unnecessary to the ultimate result.

Here the Civil Service Commission, much like the Board of Police Commissioners in *DPOA, supra*, oversaw the affirmative hiring program and reviewed the past practices of the Department. Substantial evidence of past intentional discrimination was placed before it and the Commission found that the City had intentionally discriminated in Fire Department hiring. Given the role of the Civil Service Commission, the only remaining inquiry is whether the affirmative measures themselves pass constitutional muster. *DPOA, supra*.

## IV

■ Having concluded that a legitimate basis existed for affirmative hiring in the Detroit Fire Department, the Court must now scrutinize the programs adopted by the City. *Valentine, supra; DPOA, supra*. This inquiry concerns whether the interests of white applicants were unnecessarily trammeled and whether white advancement was absolutely barred. Moreover, the duration of the program must be limited to the remediation of the imbalance.

At the time out-of-rank hiring began in 1977, the Department was approximately 19 percent black, and at the close of hiring it was approximately 24 to 25 percent black. Historically, had the Department engaged in a race-free selection process, 33 percent of the fire fighters would have been black in 1978. This point was established through

the testimony of defendants' expert, Mark Frieman. Thus, in spite of remedial efforts by the defendants, genuine balance in the Department is yet to be achieved.

The 1977–78 hiring period yielded seven classes of fire fighters with an overall composition of 35 percent white male, 63 percent black male, and a little less than 5 percent female. The percentage of blacks in the population and the percentage of blacks in the appropriate labor market has hovered near 50 percent or more since the calendar year 1976. Reference to percentage of population as a basis for remediation, where a residency requirement was a prerequisite to hiring, was entirely appropriate. *DPOA, supra.*

An end result of 24–25 percent black participation, and a process yielding a white male participation rate of 35 percent in no way unnecessarily trammeled upon the interests of white males. The defendants were faced with the task of remedying the legacy of decades of discrimination, in the foreseeable future and in a practical manner. A race conscious selection procedure was the only practical means at their disposal. Defendants were not required to wait until the year 2000 to achieve some semblance of a minority representation within the Department.

Plaintiffs assail the out-of-rank hiring with the argument that in June of 1977, 26 percent of the entry level Fire Department positions were black, and at the close of hiring the percentage was in excess of 39. This argument begs the question.

■ As a result of the seniority system, the past discriminatory conduct of the defendants impacted upon the entire Department, and not merely the entry level position. Mr. Frieman's testimony as to 33 percent clearly went to the composition of the entire Department and not merely to the entry level position of fire fighter. Defendants therefore correctly focused upon the overall Department percentage rather than the number of fire fighters at the entry level.

Plaintiffs also contend that the defendants were motivated by an anti-white animus and that affirmative action was merely a pretext for the defendants to discriminate against white males. They claim that Commissioner Jefferson really wanted to hire only blacks and that Mayor Young desired to drive whites out of the city by denying them jobs. The final results of the hiring effort in 1977 and 1978, and the relatively careful manner in which defendants proceeded, belie plaintiffs' characterization of the facts.

■ The Court can find nothing in the record that supports a claim that the purpose of the affirmative hiring was not remedial. It did not overreach its stated purposes, nor did it unnecessarily trammel the rights of white applicants. The racial composition of the Fire Department at the end of the hiring period was still only 24 to 25 percent minority. Unqualified persons were not hired. White males were not excluded, and under the circumstances, the plan did not go beyond what was reasonably necessary on a short-term basis to reach the City's legitimate goal.

■ The content of the affirmative action program adopted in 1975 and the conduct of the Civil Service Commission also preclude a finding that defendants were motivated by an anti-white male animus. The affirmative action program included a long-term goal of a fire department reflecting the racial composition of the City of Detroit. This goal was eminently reasonable in light of the racial composition and labor market in 1975 and subsequently.

In order to make a full record, the Court finds it is necessary to comment on the operational needs issue. Plaintiffs characterize that issue as follows:

[T]he defendants stand on the claim of operational needs. Reduced to its basic form, the argument rests upon the premise that blacks can communicate better with blacks than can whites with blacks; and that, according to Mr. Jefferson, each black needs a "buddy" on the Fire Department.

Plaintiffs' characterization is not well founded and must be rejected as a similar argument was rejected in *DPOA, supra.* Significant testimony at trial showed that increased racial balance in the Fire Department resulted in an enhanced ability to prevent and fight fires. That testimony was basically unrebutted. As was stated in *DPOA*:

> The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police. In short, the focus is not on the superior performance of minority officers, but on the public's perception of law enforcement officials and institutions.

608 F.2d at 696

The Court is persuaded that many of the above factors also impact upon the unique role played by fire fighters in our society, and the evidence in this case supports such a conclusion. The language quoted above applies directly to this case, if the word fire prevention is substituted for crime prevention.

## V

In summary, the Court is convinced that the remedial program adopted by the City of Detroit was a temporary measure designed to remedy the effects of the City's past discriminatory conduct. Even after the 1977–78 hiring, there still remains a conspicuous racial imbalance in the ranks of the Fire Department. The percentage of blacks at the close of hiring was approximately 24 to 25 percent, and even if the Court were to accept plaintiffs' contention that the percentage of blacks was 26 percent, the Court still finds, in light of the population of the City and the history of the Fire Department, a conspicuous imbalance. Clearly, the City's affirmative action measures were temporary and remedial, and the Court finds they clearly pass mus-

ter under both Title VII (42 U.S.C. § 2000e) and 42 U.S.C. § 1981.

Plaintiffs failed to meet their burden of showing by a preponderance of the evidence that Title VII had been violated on either a race or sex basis. Further, there is no showing that the Equal Protection Clause or Title VI have been violated.

■■■ For the reasons stated in *Baker v. City of Detroit, supra,* plaintiffs cannot prevail on their state claim under the Michigan Civil Rights Act, M.C.L.A. § 37.2101 et seq. Both the Supremacy Clause and Michigan case authority compel a finding for defendants. *See Civil Rights Commission v. Chrysler,* 80 Mich.App. 368, 263 N.W.2d 376 (1977).

It therefore follows that plaintiffs' complaint must be dismissed and a judgment of no cause of action entered on behalf of defendants. No costs, public questions being involved. Defendants may present a judgment.

This opinion shall constitute the findings of fact and conclusions of law required by FRCP 52(a).