**F. BUDDIE CONTRACTING COMPANY, Plaintiff,**

v.

**CITY OF ELYRIA, OHIO, Mayor Michael B. Keys, Defendants.**

**No. 1:90CV1067.**

United States District Court, N.D. Ohio, E.D.

Sept. 17, 1991.

10. Although the court's federal admiralty jurisdiction is invoked, only state common law claims are asserted.

**1020**

Timothy A. Marcovy, Willacy & Lopresti, Cleveland, Ohio, for plaintiff.

Terry S. Shilling, Elyria, Ohio, Lawrence S. Cohen, Freilich, Hornbaker & Rosen, Los Angeles, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND FOR PERMANENT INJUNCTION

KRENZLER, District Judge.

Once again, a court is being called upon to decide a case involving the general subject of discrimination and, in particular, a challenge to the City of Elyria, Ohio's Minority Business Enterprise Program (Chapter 168 of the Codified Ordinances of the City of Elyria, Ohio) and what is commonly called an affirmative action program or a set-aside program.

Unfortunately, in this country we have had discrimination in the past; we presently have discrimination. The way things are going, unfortunately and in all probability, we will continue to have some discrimination in at least the immediate, if not the long-term, future.

The more government and private persons of good will try to cope with the issue of discrimination, the more elusive a satisfactory result seemingly becomes.

Unfortunately, it appears that there are those who do not want to end discrimination. There are those who hope to end it immediately by the passage of legislation or other governmental action, and there are those who want to phase out discrimination in an orderly fashion, over a period of time.

The law is very clear that discrimination is illegal against persons because of race, color, creed or sex. We have the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution. In addition, there is Title VII, 42 U.S.C. §§ 2000e, *et seq.*, the Equal Employment Opportunity Act. One may ask that if the Constitution and laws are so clear, why do we need further legislation at the federal and state levels to eliminate discrimination. This is a good question that defies an answer.

There are certain words and phrases that are used repeatedly in this area of the law, such as "goals," "preference," "quota," and "affirmative action." The simple definitions of these terms are:

GOALS

The end toward which effort is directed.

PREFERENCE

To promote and put before.

QUOTA

A proportional share, such as in jobs, contracts, school admissions, etc.

AFFIRMATIVE ACTION

An act or effort to improve the employment or educational opportunities of members of minority groups and women.

The present case was initiated by the plaintiff because it was not awarded a contract by the City of Elyria when it was the lowest bidder. As will be seen below, the City defends on the basis that the plaintiff was not in compliance with its Minority Business Enterprise Program, and, therefore, it did not have to award the contract to plaintiff, even though it was the lowest bidder. As a result of this rejection of the bid, the plaintiff filed the present complaint.

PLAINTIFF'S COMPLAINT

In Count One of its complaint, the plaintiff alleges, in substance, that on or about April 4, 1983, defendant City of Elyria en-

acted Ordinance No. 83–75 entitled "Minority Business Enterprise Program" ("MBE Ordinance"), which was codified as Chapter 168 of the Codified Ordinances of the City of Elyria.

The plaintiff alleges that there has not been a legislative finding made by the Elyria City Council that the Ordinance was necessary to remedy the effects of past discrimination in the awarding of public contracts by the City of Elyria or that such discrimination has ever taken place, or that any evidence was introduced upon which the City Council could legislatively find that such discrimination has taken place.

Plaintiff further alleges that the City Council of Elyria enacted Ordinance No. 90–64 authorizing the taking of bids and the letting of a contract by the Mayor for repairs upon a stretch of Gulf Road. The plaintiff further alleges that it submitted a bid for the contract work and requested a waiver for the Minority Business Enterprise ("MBE") and Women's Business Enterprise ("WBE") quotas, and that this request for waiver was never acted upon by the City. Plaintiff further asserts that it was the lowest bid submitted on the project. Plaintiff alleges that the sole reason for the failure and refusal of the defendant City to accept plaintiff's bid and to award it the contract was the lack of compliance by plaintiff with the MBE and WBE quotas for subcontractors as set forth in Section 168.11 of the MBE Ordinance.

Plaintiff further alleges that the action of the defendants in failing and refusing to accept plaintiff's bid for the Gulf Road project and to award plaintiff the contract deprived plaintiff of its rights secured by the Fourteenth Amendment to the Constitution of the United States, the Equal Protection Clause, and that the plaintiff has sustained economic damage, harm and loss.

In Count Two, the plaintiff alleges that it has no adequate remedy at law and that by not awarding it the contract, it suffered damages and seeks to enjoin the defendants from enforcing the MBE Ordinance, both in the present case and for future contracts.

In Count Three, plaintiff alleges that the MBE Ordinance, on its face and as applied to the plaintiff, is unconstitutional and void inasmuch as it violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff is seeking a declaratory judgment pursuant to 28 U.S.C. § 2201, for the purpose of determining the controversy between it and the defendants that said MBE Ordinance is unconstitutional and void.

## DEFENDANTS' ANSWER

Defendants filed an answer in the form of a general denial, denying that the plaintiff's constitutional rights were violated under color of law and in violation of 42 U.S.C. § 1983. In addition, the defendant contends that the City of Elyria's MBE/WBE Ordinance is not a "quota" or a "set-aside" ordinance but "goal oriented" and, therefore, not racially defective.

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The plaintiff has filed a motion for partial summary judgment, together with some 500–plus pages of evidentiary material including a transcript of the deposition of defendant Michael Keys, Mayor of the City of Elyria, with exhibits attached; an affidavit of Timothy A. Marcovy, plaintiff's counsel; minutes of the meetings of the Elyria City Council, its committees and subcommittees; and other materials, together with a substantial amount of other evidentiary material.

### A. *Plaintiff's Argument*

It is plaintiff's contention that Elyria's MBE and WBE Ordinance, on its face, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff argues that the race and gender-based Ordinance cannot withstand muster under the heightened scrutiny applied to such classifications under the mandate of the United States Supreme Court. Plaintiff asserts that the record of the case reveals a lack of evidence demonstrating a compelling or important interest of the City of Elyria in enacting the race and gender-based Ordinance. Moreover, plaintiff contends that

even if a compelling or important interest were shown, no evidence exists to demonstrate that the Ordinance is narrowly tailored to achieve its purpose. Plaintiff thus asserts that the lack of such evidence satisfying the heightened scrutiny applied to race and gender-based classifications reveals an absence of issues as to material facts and that plaintiff is entitled to a judgment that the Ordinance, on its face, violates the Equal Protection Clause as a matter of law.

### B. *Defendants' Response*

Defendants respond to plaintiff's arguments, in part, as follows:

> The City of Elyria clearly has a compelling governmental interest in attempting to remedy current discriminatory acts which may be perpetrated against its minority or women business population. In point of fact the City of Elyria did indeed conduct hearings prior [sic] the enactment of these ordinances and a reading of that entire record will disclose that the City of Elyria had as its goal an attempt to grant more meaningful participation for minorities and women's business enterprises in the awarding of public contracts within the City of Elyria. The City of Elyria does indeed admit that its studies do not indicate any past practices by the City of Elyria. Its entire goal in the enacting of this ordinance is to preclude any present or future discrimination against minorities or in women's business enterprises in participating in public contracts and as such that cannot be denied to be a compelling governmental interest.

Defendants' Brief in Opposition to F. Buddie Contracting Company's Motion for Summary Judgment.

Defendants further assert that the waiver provision of the Ordinance renders it narrowly drawn to achieve its purpose. Defendants conclude that the Elyria Ordinance satisfies the heightened scrutiny applied to such classifications and that the Ordinance is not violative of the Constitution.

### MINORITY BUSINESS ENTERPRISE PROGRAM—ORDINANCES

The City of Lorain adopted Chapter 168 entitled "Minority Business Enterprise Program" ("MBEP"). Included in the MBEP, Chapter 168, is a section governing Women's Business Enterprise ("WBE"). Whenever the term "MBEP" is used, it also includes the term "WBE." The purpose of the MBEP is to promote the economic welfare of the people of the City by encouraging the establishment and expansion of minority business enterprises; to stabilize the economy; to provide and preserve employment opportunities; and to ensure the representative participation of minority business enterprises. Section 168.01.

"Minority" means United States citizens who are black, Hispanic–American, Asian–American or American Indian. Minority business enterprise, or MBE, means a business at least 51 percent owned by one or more minorities who share in the capital invested to establish and maintain the business entity as well as in the profits and/or losses of the business. Sections 168.02(a), (b).

WBE means a business at least 51 percent owned by one or more women who share in the capital invested as well as the profits or losses of the business. Section 162(c).

The general policy stated in Section 168.04 is that the purpose of the MBE program is to ensure the representative participation of all segments of the population. The Mayor of the City of Elyria has the responsibility of administering the City's MBE program, and the implementation of the program is the responsibility of the Office of Equal Opportunity.

Section 168.06 provides that the Office of Equal Opportunity ("OEO") shall certify MBEs which meet the requirements of Chapter 168 for participation in the various programs of the City.

In considering each application for certification, the OEO will determine whether persons represented in the application are members of a minority by reviewing the application and accompanying documentation, the results of staff investigation and

other relevant information. Other relevant information may include birth certificates, employment records, EEO and affirmative action records, and other evidence of the minority status of persons named in the application.

Nowhere in the statute does the certification process make any reference to the objective qualifications of an MBE. The thrust is simply that of race or sex, based on the definition in the ordinance.

In order for an MBE or a WBE to be certified, it must apply, and there is a certification process. The certification is effective for one calendar year and may be renewed.

Section 168.11 provides that any public contract valued at more than $20,000.00 shall provide that the contractor shall award subcontracts to MBEs according to the following minimum percentage of the total dollar value of the contract:

(1) Fourteen percent for construction, repair or maintenance contracts.

(2) Five percent for supplies, services or professional contracts.

Any public contract valued at $30,000.00 or more shall provide that the contractor shall award subcontracts to WBEs according to the following minimum percentage for the total dollar value of the contract:

(1) Three percent for construction, repair or maintenance contracts.

(2) Three percent for supplies, services or professional contracts.

Section 168(c) provides that at the time of submission of a bid, the bidder shall complete and attach a commitment to achieve the minimum participation percentages. Each bidder shall complete and attach a schedule of MBE and WBE participation showing all minority business enterprises and all women's business enterprises that will participate as subcontractors or joint venturers in the contract, and a signed letter of intent from each MBE or WBE listed on the schedule.

The Mayor may authorize a partial or total waiver of the subcontractor requirements upon application and demonstration by the contractor that there are not suffi-cient qualified MBEs or WBEs reasonably available to the contractor to fulfill the minority or women's subcontracting requirements. Section 168.11(d).

Section 168.15(f) provides that the contractor's commitment to a specific goal for minority business enterprise utilization is required and shall constitute a commitment to make every good faith effort to meet such goal by subcontracting to or undertaking a joint venture with minority business enterprise firms. If a contractor fails to meet the goal, it will carry the burden of furnishing sufficient documentation, as part of the bid response, of its good faith efforts to justify a grant of relief from the goal set forth in the notice.

If a bidder requests a waiver and submits the information required by Section 168.15(f), and the waiver is denied, the contractor has a right of appeal, first to the Director of Safety–Services and, if not satisfied with the director's decision, to the Community Relations Board. Section 168.-15(h).

The plaintiff, F. Buddie Contracting Company, submitted its bid to the City of Elyria. In regard to MBEs and WBEs, the City of Elyria provided forms to be filled in by the bidder. In Form A, which dealt with MBE and WBE subcontracting, the plaintiff stated that it would carry out the MBE/WBE subcontracting program. On Form B, the plaintiff checked the box that stated that the bidder was unable to secure MBE participation and was therefore attaching a waiver request. The same was stated regarding the WBE participation.

The plaintiff then submitted two Form Fs which are unavailability certifications in regard to the MBEs and WBEs. It noted that the job being bid was a highly specialized construction job and that there were no MBEs or WBEs available. The plaintiff stated nothing more. Further the City did not expressly advise the plaintiff that its request for a waiver was denied so it was not able to take an appeal provided for in Section 168.15(h). The next thing that happened was the awarding of the contract to someone other than the plaintiff.

In his deposition, Mayor Keys stated that the lack of compliance with Chapter 168 was the reason the contract was not awarded to the plaintiff and was given to the next lower bidder. He testified further that there was no sufficient reason for inability of the plaintiff to have MBE and WBE participation in the project and, according to the OEO officer, no sufficient showing of good faith efforts to attain the same. The Mayor testified that he did not expressly advise the plaintiff that its waiver was denied. He stated that awarding the contract to someone else, in effect, was a denial of the waiver but there was not an express denial of the request for a waiver.

It is noted that on May 15, 1990, R.E. Warner & Associates, the City's consultant, sent a letter to the City engineer stating that it had reviewed the five bids that were opened on May 9, 1990, and recommended that the award be made to the lowest bidder, F. Buddie Contracting Company, Cleveland, Ohio, in the amount of $224,180.50. The contract was awarded to Joseph Lachs Construction Company who bid $243,295.00.

## GENERAL DISCUSSION

Lower courts and the public look to the United States Supreme Court and its pronouncements to settle the law and to give guidance to these courts in deciding cases and to the public in the conduct of its business affairs.

It may appear to some that there is an inconsistency in some of the recent Supreme Court decisions involving affirmative action as it relates to the federal government under the Fifth Amendment, local government under the Fourteenth Amendment in regard to both the Equal Protection Clause and also Title VII.

It will be seen later in this opinion that laws passed by the Congress are treated differently than laws passed by local governments in regard to equal protection and also that affirmative action plans, whether governmental or private, are treated differently under Title VII. However, this is not a Title VII case but an equal protection case.

In order to decide this case, it is necessary to review some prior United States Supreme Court and Circuit Court of Appeals decisions involving both the Equal Protection Clauses of the Fifth and Fourteenth Amendments, as well as Title VII. They are: *Richmond v. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *United States v. Paradise*, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987); *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In addition, *Michigan Road Builders Association, Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987), and *Valentine v. Smith*, 654 F.2d 503 (8th Cir.1981), will be discussed.

We start with the proposition that the Equal Protection Clauses of the Fifth and Fourteenth Amendments to the United States Constitution require equal treatment of all classes of people. If there had been no past or present discrimination against any group, minority or women, there would be no need for civil rights legislation to cure past or present discrimination. But, unfortunately, there has been past discrimination, and there currently is present discrimination.

The Congress of the United States took a major step when it adopted the Minority Business Enterprise provision of the Public Works Employment Act of 1977 in which it provided for, among other things, a 10 percent set-aside for minority business enterprises. Under implementing regulations and guidelines, grantees and private prime contractors who receive federal funds are required, to the extent feasible in fulfilling the 10 percent minority business enterprise requirement, to seek out all available qualified, bona fide MBEs; to provide technical assistance, as needed; to lower or waive bonding requirements where feasible; and

to solicit the aid of the Office of Minority Business Enterprise, etc.

The Supreme Court, in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), held, in substance, that it did not violate the Equal Protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution when Congress provided a 10 percent set-aside to minority business enterprises. The various justices of the Supreme Court stated, in substance, that this act passed by Congress constituted a valid means of achieving the objective so as not to violate the equal protection component of the Due Process Clause of the Fifth Amendment, and that the minority business enterprise provision was not inconsistent with the requirements of Title VI of the Civil Rights Act of 1964. It was held that the racial classifications employed in the set-aside provision was substantially related to the achievement of the important and congressionally articulated goal of remedying the present effects of past racial discrimination in the area of public contracting and that the 10 percent set-aside requirement did not violate Title VI of the Civil Rights Act of 1964.

It is noted that the Congress, in effect, concluded that there had been past and present racial discrimination, and, therefore, the Congress adopted the minority business enterprise legislation.

Congress did not make express findings of past discrimination, and the Supreme Court did not require such findings. The Supreme Court stated that Congress has abundant historical bases from which it could conclude that traditional procurement practices could perpetuate the effects of prior discrimination.

In *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), there was a collective bargaining agreement that provided for layoffs based on seniority with special protection for minorities. In this case, the United States Supreme Court held that there must be some convincing evidence of prior discrimination by the governmental unit involved before allowing limited use of racial classifications to remedy such discrimination. This was an equal protection case. The Supreme Court said that governmental agencies cannot rely on broad brush assumptions of historical discrimination. The Supreme Court held the following:

(1) Any governmental classification or preference based on racial or ethnic criteria must be justified by a compelling governmental interest and the means chosen by the government to effectuate its purpose must be narrowly tailored to the achievement of that goal.

(2) Such means are subject to strict scrutiny and must be tested by a standard more stringent that reasonableness.

(3) A public employer must have convincing evidence of prior discrimination in its employment practice before it embarks on an affirmative action program.

(4) The existence of societal discrimination, without more, is an insufficient basis for imposing racially discriminatory legal bases that work against innocent people.

(5) In order to remedy the effects of prior racial discrimination, a state may implement a race-based plan under which innocent parties are called upon to bear some of the burden provided that their share of the burden is relatively light and diffused among society generally.

(6) Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination. For this proposition, the Supreme Court, in *Wygant,* cited to *University of California Regents v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 2748, 57 L.Ed.2d 750 (1978).

There is a distinction between societal discrimination and governmental discrimination. Societal discrimination alone is not sufficient to justify a racial classification. The Supreme Court has always insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination. *See Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Absent employment discrimination by a govern-

mental agency, non-discriminatory hiring practices will, in time, result in a work force more or less representative of the racial and ethnic composition of the population of the community from which the employees are hired. The question is whether societal discrimination can be imputed to government, so that the government can base the affirmative action plan on society's discrimination rather than the government's. It appears from all of these cases that the governmental agency itself must have engaged in some prior discriminatory practice in order for it to adopt an affirmative action plan. It was stated in *Wygant* that societal discrimination without more is too amorphous a basis for imposing a racially classified remedy. In other words, a governmental agency must ensure that before it embarks on an affirmative action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination by that governmental agency.

In *Johnson v. Transportation Agency*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), a county agency established a voluntary affirmative action plan for hiring and promoting minorities and women. The plan provided that in traditionally segregated job classifications in which women had been significantly underrepresented, the agency was authorized to consider as one factor, the sex of a qualified applicant. The long-term goal was to attain a work force whose composition reflected the proportion of minorities and women in the area labor force.

In *Johnson*, the Supreme Court held that an employer seeking to justify the adoption of an affirmative action plan need not point to its own discriminatory practices but need only point to a conspicuous imbalance in the traditionally segregated job categories.

It appears that the United States Supreme Court wanted to encourage employers to adopt affirmative action plans to make up for past discriminatory practices in regard to minorities and women without an express finding or an admission that there was discrimination. It seems that this fits a standard called "the ends justify the means."

In *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), a private employer adopted a voluntary affirmative action plan that gave preference to black employees over more senior white employees in admission to in-plant craft training programs. It was held not to violate 42 U.S.C. §§ 2000e–2(a), (d). This was a Title VII case and not an equal protection case.

Under the facts in *Weber*, the company's craft force was almost exclusively white. The district court found for the whites, and its decision was affirmed by the Fifth Circuit Court of Appeals but reversed by the United States Supreme Court which held that if the plan were not approved, one could never end discrimination. It pointed out that § 2000e is an act of Congress, not a constitutional provision. Also, this was a private employer and did not involve governmental action. The purpose of § 2000e is to eliminate a manifest racial imbalance and not to maintain racial balance.

Also, the Supreme Court noted that the inquiry in this case was very narrow and that it did not involve state action so the Fourteenth Amendment's equal protection problem was not involved.

Further, the Supreme Court noted that private, voluntary, race-conscious affirmative-action efforts would hasten and eliminate discrimination, and these plans are valid.

The Court further stated that Title VII, Sections 703(a) and (d), Prohibition Against Racial Discrimination, does not condemn all private, voluntary, race-conscious affirmative-action plans. The plan was not intended to maintain racial balance but simply to eliminate a manifest racial imbalance.

It is noted that *Weber* permits private persons under Title VII to do what local government cannot do under the Fourteenth Amendment. *Weber* talks of conspicuous racial imbalance in traditionally segregated job categories.

Subsequently, on January 23, 1989, the United States Supreme Court decided *Rich-*

*mond v. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Therein, the City of Richmond, Virginia, passed legislation providing for a set-aside program for minority business enterprises. It based its actions on *Fullilove v. Klutznick, supra.* However, the Supreme Court of the United States, in *Croson,* held that as a condition precedent to adopting such legislation there must be a finding of past or present discrimination. In other words, the Supreme Court said that there must be evidence pointing to identified discrimination in the City's construction industry and the fact that there is past societal discrimination alone cannot serve as the basis for such a rigid racial preference.

The Supreme Court, in *Croson,* did acknowledge that there was a history of both private and public discrimination in the United States and that it had contributed to a lack of opportunities for black entrepreneurs. This history, standing alone, could not justify a rigid racial quota in the awarding of public contracts in a particular city.

A generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury the legislature seeks to remedy.

The Supreme Court, in *Croson,* further stated that the City's designation of a plan as "remedial" was entitled to little or no weight because racial classifications are suspect and simple legislative assurances of good intention cannot suffice. Further, a strong basis in evidence for a city's conclusion that remedial action was necessary was not provided by highly conclusory statements of a proponent of the plan that there was racial discrimination in the construction industry in the area, the state and around the nation.

The Supreme Court, in *Croson,* further held that the fact that Congress, in effect, found discrimination in adopting 42 U.S.C. § 6705(f)(2) based on what it stated was nationwide discrimination in the construction industry, cannot be used as a basis for concluding that there was discrimination in the City of Richmond in such a limited area. Congress did state that the scope of the problem could vary from market area to market area. The Supreme Court then went on to state that while Congress could be very general in its findings, a state or local government must do more under the constraints of the Equal Protection Clause than to find a congressional report on the subject in order to enact a set-aside program.

■ Normally, legislative bodies are entitled to a presumption of regularity in their actions. But when a legislative body chooses to employ a classification which is suspect under the Equal Protection Clause to the federal constitution's Fourteenth Amendment, the legislative body cannot rest upon a generalized assertion as to the classification's relevance to the legislative body's goals.

Briefly stated, the Supreme Court, in *Fullilove,* permitted the Congress to make generalized conclusions in regard to discrimination in adopting the federal set-aside program. However, the Supreme Court, in *Croson,* distinguished between Congress' power and authority to make such findings and the power and authority of local governments to adopt such set-aside programs. It, in effect, distinguished between Congress and local governments and required local governments to make express findings of past or present discrimination as a condition precedent to the adoption of a set-aside program for minority business enterprises.

Thus, there appears to be a distinction between what is necessary for Congress to find and determine and what is necessary for local governments to find and determine prior to adopting a set-aside program.

It is appropriate to recite and paraphrase some of the additional teachings of *Croson.* The Supreme Court noted that in *Bakke,* 438 U.S. at 288–289, 98 S.Ct. at 2747–48, the Court was confronted with a racial quota which was employed by the University of California at Davis Medical School. Under the plan, 16 out of the 100 seats in each entering class at the School were reserved exclusively for certain minority groups. Among the justifications offered

in support of the plan were the desire to reduce the historic deficit of traditionally disfavored minorities in medical school and the medical profession and the need to counter the effects of societal discrimination. *Croson*, 488 U.S. at 496, 109 S.Ct. at 722.

In *Bakke*, five members of the Court determined that none of these interests could justify a plan that completely eliminated non-minorities from consideration for a specified percentage of opportunities.

Justice Powell's opinion in *Bakke* applied the standard of heightened scrutiny under the Equal Protection Clause to the racial classification at issue. He stated that the desire to have more black medical students or doctors standing alone was not merely insufficiently compelling to justify a racial classification, it was discrimination for its own sake, forbidden by the Constitution. Also, he stated that a history of discrimination in society at large does not justify a racial quota in medical school admissions. Justice Powell contrasted the goal of remedying wrongs worked by specific instances of racial discrimination with the remedying of the effects of societal discrimination. He indicated that for the governmental interest in remedying past discrimination to be triggered, judicial legislative or administrative findings of constitutional or statutory violations must be made. Only then does the government have a compelling interest in favoring one race over another.

■ A generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.

While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, could not justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. *Croson*, 488 U.S. at 499, 109 S.Ct. at 724. The Court further stated in *Croson* that the 30 percent quota could not, in any realistic sense, be tied to any injury suffered by anyone. *Id.*

The Supreme Court further stated that none of the findings by the City of Richmond provide the City with a strong basis in evidence for its conclusion that remedial action was necessary. There was nothing approaching a *prima facie* case of a constitutional or statutory violation by anyone in the Richmond construction industry.

■ The Court further noted that when special qualifications are required to fill particular jobs, comparisons to the general population rather than to the smaller group of individuals who possess the necessary qualifications may have little probative value. In the employment context, the Court noted, in *Croson*, that it has recognized that for certain entry-level positions requiring minimal training, statistical comparisons of the racial composition of an employer's work force to the racial composition of the relevant population may be probative of a pattern of discrimination. *See Teamsters v. United States*, 431 U.S. 324, 337–38, 97 S.Ct. 1843, 1855–56, 52 L.Ed.2d 396 (1977). But, where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task. *See Hazelwood School District v. United States, supra,* and *Johnson v. Transportation Agency, supra.*

The Supreme Court went on to state that the City of Richmond did not even know how many MBEs in the relevant market were qualified to undertake prime or subcontracting work in the public construction projects. The Court further stated that, to a large extent, the set-aside of subcontracting dollars seemed to rest on the unsupported assumption that white prime contractors simply would not hire minority firms.

The Supreme Court further said that the City of Richmond relied on Congress' findings in connection with the set-aside approved in *Fullilove* that there had been nationwide discrimination in the construction industry. The probative value of these findings for demonstrating the existence of discrimination in Richmond was extremely

limited. The fact that Congress has made national findings that there had been societal discrimination may have saved *Fullilove* but it did not apply to *Croson.* The Supreme Court further stated that if all a state or local government would need do is find a congressional report on the subject to enact a set-aside program, constraints of the Equal Protection Clause would, in effect, have been rendered a nullity. The Supreme Court further said that none of the evidence presented by the City of Richmond pointed to any identified discrimination in the Richmond construction industry. The Court then held that the City had failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race and that to accept Richmond's claim that past societal discrimination alone could serve as a basis for rigid racial preference would be to open the door to competing claims for remedial relief for every disadvantaged group. The dream of a nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs.

In regard to the 30 percent quota in Richmond, the Court, in *Croson,* stated that this quota could be said to be narrowly tailored to any goal except, perhaps, outright racial balancing. It rested upon the completely unrealistic assumption that minorities would choose a particular trade in lockstep proportion to their representation in the local population. *See Sheetmetal Workers v. E.E.O.C.,* 478 U.S. 421, 494, 106 S.Ct. 3019, 3059, 92 L.Ed.2d 344 (1986).

The Supreme Court went on to say that nothing would preclude a state or local entity from taking action to rectify the effects of identified discrimination within its jurisdiction. It stated that if the City of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities, it could take action to end the discriminatory exclusion. Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. Under such circumstances, the City could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. *Croson,* 488 U.S. at 509, 109 S.Ct. at 729.

Further, the Supreme Court stated that even in the absence of evidence of discrimination, the City had at its disposal a whole array of race neutral devices to increase the accessibility of City contracting opportunities to small entrepreneurs of all races, such as simplification of bidding procedures, relaxation of bonding requirements and training and financial aid for disadvantaged entrepreneurs of all races, would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect.

In *Michigan Road Builders Assn., Inc. v. Milliken,* 834 F.2d 583 (6th Cir.1987), the Sixth Circuit held that preferring members of any one group for no reason other than race or ethnic origin is discriminatory for its own sake and the Constitution forbids this practice.

The Sixth Circuit noted that when the Congress of the United States passed the minority business enterprise set-aside provisions, 42 U.S.C. § 6705(f)(2), which required local governmental units receiving funds under public works programs to use 10 percent of the funds to procure services or supplies from MBEs, the Supreme Court determined that Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination, and that the set-aside provision at issue was narrowly tailored to the achievement of the goal of ameliorating the effects of past discrimination.

■ Racial classifications must be assessed under the most stringent level of

review because characteristics which bear no relation to individual merit or need are irrelevant to most types of decisions. In other words, in tailoring relief for discrimination based upon a suspect classification, the strict scrutiny standard must adhere, and relief must be narrowly tailored.

The Sixth Circuit, in *Michigan Road Builders,* held that two things must be considered. First, a racial classification must be justified by a compelling governmental interest, and, second, the means chosen by the state to effectuate its purpose must be narrowly tailored to achieve the goal.

A state or local government unquestionably has a compelling interest in remedying past and present discrimination by the state. *See United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987).

In *Michigan Road Builders,* the Sixth Circuit further stated that, in particular, a state must ensure that before it embarks on an affirmative action program it must have convincing evidence that remedial action is warranted. Thus, it must have sufficient evidence to justify the conclusion that there has been prior discrimination. Adequate findings must have been made to ensure that the governmental body is remedying the present effects of past discrimination, rather than advancing one racial or ethnic group's interests over another.

The Sixth Circuit, in *Michigan Road Builders,* concluded that after reviewing the record in its entirety, it has developed that the Michigan legislature had little, if any, probative evidence before it that would warrant a finding that the State of Michigan had previously discriminated against MBEs in awarding state contracts for the purchase of goods and services. The Court then concluded that the State has not supported its conclusion that it had a compelling interest in establishing the racial and ethnic classifications contained in Public Act 428, and the classifications were, therefore, constitutionally invalid. For a similar holding in a Title VII case, see *Long v. City of Saginaw,* 911 F.2d 1192 (6th Cir.1990).

One case that expresses a large number of axioms that have now become adopted and well accepted is *Valentine v. Smith,* 654 F.2d 503 (8th Cir.1981).

■ The court in *Valentine* held, first, that a race-conscious, affirmative action plan is substantially related to remedying past discrimination if its implementation results, or is designed to result, in the hiring of a sufficient number of minority applicants so that the racial balance of the employer's work force approximates roughly but does not unreasonably exceed, the balance that would have been achieved absent the past discrimination. Further, the plan must be temporary and must not require hiring of unqualified persons nor can it bar whites or otherwise invidiously trample their interests. *Id.* at 510. The equal protection guarantee does not prohibit states from taking appropriate measures to remedy the effects of past discrimination. However, a predicate for that remedy is that the governmental agency must make findings of past discrimination before a plan is implemented. Absent findings of past discrimination, courts cannot ascertain that the purposes of an affirmative action plan are legitimate. Findings of past discrimination on which an affirmative action plan is based enable courts to ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action. Any racial preferences to remedy past discrimination must receive a searching examination to make certain that they do not conflict with the constitutional guarantees of the Fourteenth Amendment. A plan must not result in the hiring of unqualified applicants. So long as an affirmative action plan to remedy past discrimination does not result in hiring of unqualified persons, any stigma caused by the plan is constitutionally acceptable.

## CONCLUSION

■ Based on the foregoing authorities, in order for a municipality to adopt a constitutionally valid MBE and/or WBE set-aside or affirmative action plan, it must do at least the following:

(1) Make a finding of past or present discrimination in the area to be covered by the legislation, based on objective facts, and;

(2) narrowly tailor the relief for the past or present discrimination in achieving its goals;

(3) objectively provide for qualified minority business enterprises and women business enterprises, and;

(4) provide for a reasonable time limitation, rather than having open-ended legislation. This may either be by chronological time or by a time period in which a stated result is achieved.

This Court finds that Elyria's ordinance is a race and gender-based classification which must withstand a heightened scrutiny in order to pass muster under the United States Constitution. Race-based classifications must be narrowly tailored to achieve a compelling governmental interest. *Wygant v. Jackson Board of Education*, 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). Gender-based classifications must be substantially related to the achievement of an important governmental interest. *Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980). Although plaintiff contends that remedying past discrimination is the only compelling interest a government entity may have in enacting race-based legislation, a state "unquestionably has a compelling interest in remedying past and present discrimination by a state actor." *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987). This standard similarly applies to the City of Elyria as a government actor. Defendants assert that a reading of the record of the case provides sufficient evidence to show that Elyria's goal in enacting the legislation was to remedy present discrimination in the hiring of MBEs and WBEs for city-funded projects. Defendants have failed, however, to produce evidence indicating that discrimination in the hiring of MBEs and WBEs for city-funded projects existed in the past or presently exists. It is clear from the purpose clause of the ordinance that the City's goal was to remedy present discrimination and, thus, the evidence directed to this Court adds nothing to defendants' case. Defendants must make a finding based upon material factual evidence that past and/or present discrimination exists in the hiring of MBEs and WBEs for city-funded projects. Since this has not been done in the instant case, the City has not shown a compelling governmental interest in enacting the race-based ordinance. Such lack of evidence also reveals that defendants have shown no important governmental interest in enacting the gender-based ordinance. Thus, no issue of material fact concerning the City's compelling governmental or important governmental interests has been shown, and the heightened level of scrutiny has not been satisfied. This Court therefore finds the ordinance's facial preferential treatment of MBEs and WBEs a violation of the Equal Protection Clause of the Fourteenth Amendment as a matter of law.

This Court further notes that Elyria's race-based classification is not narrowly tailored to achieve its purpose. Defendants must show that less discriminatory alternatives were attempted before enacting the race-based legislation. *Croson*, 488 U.S. at 507, 109 S.Ct. at 728. Presently, defendants have produced no evidence which reveals an attempt to use race-neutral means to remedy past or present discrimination.

Moreover, Elyria's ordinance provides no reasonable objective standard for determining whether a minority business enterprise is qualified to practice a particular trade. This Court finds that the ordinance's present imposition of subcontractors to contractors merely on the basis of race or gender, without a consideration of the subcontractors' trade qualifications, is inconsistent with the requirement that a remedial measure must amount to the least restrictive means of remedying present or past discrimination. This Court does not believe that the waiver provision of the ordinance adequately negates qualification problems. A contractor hiring a business enterprise unqualified in the trade could

bid lowest on a project and win the contract where other contractors who seek non-minority enterprises qualified in the trade and who apply for waivers will be denied the contract. Thus, this Court finds that Elyria's ordinance is not narrowly tailored to achieve its remedial purpose.

Therefore, although this Court finds Elyria's ordinance a laudable effort to remedy discrimination, defendants have produced no evidence which indicates past or present discrimination in the hiring of MBEs and WBEs by the City of Elyria. Defendants have, thus, not demonstrated a compelling governmental interest. Nor has evidence been produced to establish that the ordinance is narrowly tailored to achieving its purpose. Since no issue of material fact exists regarding the unconstitutionality of Elyria's ordinance, plaintiff is entitled to judgment that the ordinance, on its face, violates the Equal Protection Clause of the Fourteenth Amendment as a matter of law.

■ In order for a local governmental agency to adopt a valid set-aside or affirmative action plan, it must first find past or present discrimination in fact and the purpose of the plan must be to cure the present effects of the past discrimination.

The City of Elyria did not make such findings but merely stated that its goal is an attempt to create more meaningful participation for minority business enterprises in the awarding of public contracts with the City of Elyria. This is a commendable goal. But its efforts and attempts to implement the goal by discriminatory conduct are invalid. In order to provide minorities with a present "edge" in employment and/or contracts, there must be an objective finding of past or present discrimination, and the objective of the ordinance must be to overcome the present effects of past discrimination.

As stated above, the goal of providing minorities jobs and contracts is commendable but it is the method the City of Elyria attempted to use to achieve this goal that is wrong. The City must do more than state a commendable goal and then achieve it by this type of ordinance. *Richmond v. Croson* does not permit this type of action.

■ There must be an ordinance setting forth the objective standards to qualify for MBEs. Just a blank statement that defines MBEs as at least 51 percent minority membership and WBEs as at least 51 percent owned by one or more women is not enough. There must be some objective standard as to qualifications.

The defendant City of Elyria contends that it is not controlled by *Croson* and further that it did not establish quotas but merely attempts to meet goals of minority participation.

■ While the defendant contends that it only has a goal of meeting minority participation, when it in fact applied the percentages to minority business enterprises and women's business enterprises, it went beyond the mere statement of a goal but implemented a quota without a finding of past discrimination by the City or by contractors or subcontractors in regard to City contracts. Calling a quota a goal will not convert a quota into a goal. A quota is a quota no matter what it is called.

The current law controlling state and local governments in adopting minority business enterprise, women business enterprise, and set-aside legislation is controlled by *Croson*. *Croson* clearly requires a finding of past or present discrimination. If there is, in fact, past discrimination in a particular industry, it is relatively easy for a governmental agency to do the necessary investigative work to reach this conclusion and upon which to base its legislation. Based on *Croson*, governmental agencies know, or should know, that mere assertions of past discrimination or present discrimination and mere assertions such as goals to eliminate past discrimination will not pass muster. All these governmental agencies succeed in doing is further delay in adopting constitutionally valid legislation which will expedite awarding contracts to minorities and hiring minorities. Enacting legislation contrary to the dictates of *Croson* only prolongs and continues discrimination.

After the Supreme Court's decision in *Croson* in 1989, the City of Elyria had its choice of making the findings of past or

present discrimination required by *Croson* or to stand pat and rely on *Fullilove* to sustain any attack on its MBE/WBE program.

The City of Elyria erroneously decided to rely on *Fullilove* and not comply with the requirements of *Croson*. Had the City followed *Croson* and found past and/or present discrimination, its MBE/WBE program would, in all probability, have been sustained. Unfortunately, the City did not follow *Croson* and chose to stay with *Fullilove*, and, thus, it must deal with the consequences. The City knew, or should have known, of the distinction between *Fullilove* and *Croson* and had it followed *Croson*, in all probability we would not be here today. This Court has no choice but to follow *Croson*.

■ Based on the foregoing, this Court concludes as follows:

(1) Chapter 168 of the Elyria Codified Ordinances is in violation of the Equal Protection Clause of the United States Constitution to the extent that:

(a) It has not made the appropriate findings that its purpose was to eradicate the present effects of past and/or present discrimination.

(b) It is not narrowly tailored to achieve its results.

(c) It does not set forth objective criteria for qualifications for minority business enterprises and women's business enterprises.

(d) It does not have a time limitation.

(2) The failure and refusal of the defendants, City of Elyria and Mayor Michael Keys, to act on plaintiff's application for a waiver and to award the plaintiff a contract for the work on the Gulf Road project authorized by Ordinance No. 90–64 solely because of plaintiff's non-compliance with the MBE Ordinance violated plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

(3) The defendants are permanently enjoined from enforcing Chapter 168 of the Elyria Codified Ordinances in its present form until such Ordinances are amended to be consistent with this Opinion.

Because the plaintiff was the lowest bidder, coupled with the fact that no action was taken on his application for a waiver, and he was not awarded the contract, the plaintiff shall prevail on all three counts of the complaint, and we will proceed to determine damages in subsequent proceedings to be held on *October 15, 1991, at 9:30 a.m.*